69 F.3d 1417
 43 Fed. R. Evid. Serv. 110, 95 Cal. Daily Op.
Serv. 7504,
95 Daily Journal D.A.R. 12,851
UNITED STATES of America, Plaintiff-Appellee,
v.
Burton P. GOLB and Daniel A. Morales, Defendants-Appellants.
 Nos. 92-10680, 92-10736, 94-10536 and 94-10537.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted May 9, 1995.
Decided Sept. 26, 1995.
 
 Michael D. Gordon, Assistant Federal Public Defender, Phoenix, Arizona, for defendant-appellant Burton P. Golb.
 Michael L. Crowley, San Diego, California, for defendant-appellant Daniel Morales.
 Thomas Colthurst, Assistant Attorney General, United States Department of Justice, Washington, D.C., for plaintiff-appellee.
 Appeals from the United States District Court for the District of Arizona.
 Before: CUMMINGS,* SCHROEDER and RYMER, Circuit Judges.
 CUMMINGS, Circuit Judge:
 
 
 1
 Morales and Golb were two of twelve defendants named in a fifteen-count indictment charging numerous counts of money laundering, drug trafficking, conspiracy and forfeiture. Following a four-month trial, a jury convicted Morales of five counts of money laundering and one count of conspiracy to import drugs, and Golb of four counts of money laundering. Both defendants' money-laundering counts were based on brokering the purchase of various aircraft with laundered money for Colombian or Mexican drug traffickers. On October 12, 1993, almost a year after he received his 235-month sentence, Morales joined by Golb moved for a new trial based on the government's refusal to turn over the prior grand jury testimony of Antonio Aizprua, the principal witness in support of the drug charges. Finding a Brady violation, the district court granted Morales a new trial on the single drug conspiracy charge which the government later dismissed. Both defendants raise numerous issues challenging their convictions and sentences as well as the district court's failure to grant them a new trial on all charges.
 
 Background
 A. Daniel Morales
 
 2
 Morales began selling planes, parts, and services to drug traffickers in the mid-1980s, from his job as Latin American representative for Downtown Airpark ("Downtown") in Oklahoma City, Oklahoma. Downtown was a sales and service agent for GulfStream Aero Commanders, a type of plane favored for use in large-scale drug operations.
 
 
 3
 In October 1985, at the suggestion of a Colombian drug trafficker named Cuco Rodriguez, Morales recruited a pilot named Antonio Aizprua to fly planes for a drug-trafficking operation headed by one of Morales' clients, Dr. Fidel Kosonoy. Morales had sold Kosonoy the Aero Commander 1000 that Aizprua was to pilot. Aizprua had previously flown an Aero Commander to Colombia for Rodriguez to replace a plane that had been seized in Mexico while loaded with cocaine. Aizprua had also been involved in an aborted cocaine smuggling flight for Rodriguez in September 1985 in which he was forced to abandon his plane after being intercepted by United States Customs agents.
 
 
 4
 Aizprua twice flew Kosonoy's Aero Commander 1000, loaded with over 700 kilos of cocaine, from Colombia to Mexico. Morales arranged payments to Aizprua of $80,000 for each flight. On February 7, 1986, however, Aizprua was arrested in Los Angeles on charges stemming from the aborted September 1985 flight.
 
 
 5
 Morales' involvement with drug smugglers continued into 1986. He represented an individual named Roberto Franco in a deal to purchase a Piper Navajo for $225,000, and agreed to pay an additional 2 percent fee to the seller's representative to accept cash. The representative later testified that Morales was pleased by these terms and indicated that he had other clients who would be willing to "clean up" their dollars by similar transactions. Morales did not finish this deal, however; he bowed out before its conclusion and was replaced by Burton Golb, Franco's brother-in-law. Golb also apparently indicated an interest in "cleaning up" money via these cash sales.
 
 
 6
 The United States government subsequently investigated Downtown and seized six Aero Commanders brokered by Morales, who moved to Scottsdale, Arizona, and opened his own aircraft brokerage, Aero Executive International ("AEI"). Morales continued to broker planes to Latin American drug dealers, in the process supplying his clients with necessary tools of their trade as well as a means of laundering their drug profits. This time, however, Morales relied on wire transfers from banks in Panama and Mexico rather than direct cash sales. The transactions worked in the following manner: a money launderer named Nazareth Andonian, fronting as a legitimate gold dealer, would receive millions of dollars a day in small-denomination cash (heavily powdered with cocaine), which he would then use to purchase gold at above-market prices. He then sold the gold at below-market prices for checks or wire transfers directed to the Latin American bank accounts, from which funds were transferred to AEI's corporate account.
 
 B. Burton Golb
 
 7
 In 1988, Burton Golb opened Air North Aviation Corporation ("Air North") in Houston, Texas. Like AEI, Air North was an airplane brokerage business that catered to Latin American customers. Air North's two main clients, Air Colombia and Air Caribe, both were based in Colombia and owned by an individual named Ruben Osorio; Air Caribe was managed by Roberto Franco, who had bought the Piper Navajo for cash. Payments from both of these companies came from third-party accounts outside of Colombia: some payments came from the Andonian organization, others from a different money launderer, the Sharir organization, which used the same method of exchanging tainted cash for gold. Golb served as a pooling point for these diverse funds and thus provided a valuable service to his Colombian clients.
 
 C. The trial and its aftermath
 
 8
 On July 14, 1992, after a four-month joint trial of Morales and Golb, a jury convicted Golb of four counts of money laundering: Counts III and IV involved the sale of Aero Commander XBDSA to Franco and Air Caribe while Counts VII and VIII involved the attempted purchase of six Basler DC-3 turbo-prop conversions for Air Colombia. The jury also convicted Morales of five counts of money laundering based on three separate airplane transactions brokered by AEI in 1988. Count II involved the sale of Lear Jet N127HC to an alleged Mexican drug trafficker. Counts III and IV involved the same sale of Aero Commander XBDSA for which Golb was convicted. Counts V and VI involved the sale of Aero Commander 9945S to Cuco Rodriguez. Morales was also convicted on a drug conspiracy charge based on Aizprua's smuggling flights for Kosonoy's organization.
 
 
 9
 Morales filed a motion for a new trial on October 12, 1993, alleging Brady[1] and discovery violations relating to Aizprua's testimony. Golb joined this motion. On October 13, 1994, the district court granted the motion in part and ordered a retrial solely on the drug conspiracy count against Morales; the government then dismissed that single count.
 
 
 10
 Both defendants contend on appeal that the alleged Brady violation requires that we also vacate their money-laundering convictions. They also challenge the sufficiency of the evidence supporting these convictions as well as various evidentiary rulings, jury instructions, and their sentences. Golb claims error in his joinder with Morales and improper venue on counts VII and VIII.
 
 Discussion
 I. Sufficiency of the evidence
 
 11
 "There is sufficient evidence to support a conviction if any rational trier of fact, after viewing the evidence in the light most favorable to the government, could have found the defendant guilty beyond a reasonable doubt of each essential element of the crime charged." United States v. Stauffer, 922 F.2d 508, 514 (9th Cir.1990). Convictions appealed from in this case are under two federal money laundering statutes.
 
 
 12
 Counts II, IV, VI, and VIII charged violations of 18 U.S.C. Sec. 1956(a)(1)(B)(i), aimed at financial transactions that are intended to conceal the source of illegal proceeds. In the present case, where the underlying unlawful source is drug trafficking, the government must prove that the defendants:
 
 
 13
 1. Conducted a financial transaction with drug proceeds,
 
 
 14
 2. knew that the funds were drug proceeds,
 
 
 15
 3. knew that the transaction was designed in whole or part to conceal or disguise the nature, location, source ownership or control of drug proceeds.
 
 
 16
 United States v. Garcia, 37 F.3d 1359, 1364 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1699, 131 L.Ed.2d 562 (1995).
 
 
 17
 Counts III, V and VII charged violations of 18 U.S.C. Sec. 1956(a)(1)(A)(i), which is aimed at transactions promoting specified unlawful activities. The first two elements are the same as under Sec. 1956(a)(1)(B)(i), but the third is replaced with the requirement that the defendant acted "with the intent to promote the carrying on of specified unlawful activity [i.e., drug trafficking]." 18 U.S.C. Sec. 1956(a)(1)(A)(i).
 
 A. Count II--Lear Jet N127HC
 
 18
 AEI brokered the sale of this Lear Jet to Baltazar Diaz, an alleged drug trafficker from Mexico, in March and April 1988. Morales acquired the plane from Gates Lear Jet with six bank drafts from Banco del Atlantico Tijuana, totalling $1,815,000, and kept the jet in Scottsdale until December 1988 when he exported it to Mexico. While the plane was still at AEI, Diaz used it occasionally. For export, the plane was titled to Aeroservices Ejecutives Sindoneses, SA, a Mexican air-taxi service controlled by Diaz.
 
 
 19
 Four months after it left Scottsdale, the plane was back in Tucson for repairs. Brian Snyder, an AEI employee, testified that while the plane was in Tucson, Morales told him that it could be had for half its value because it had been used for drug smuggling and would be seized if returned to Mexico. Snyder further testified that Morales told him that Diaz was hiding out and wanted for drug smuggling in Mexico. Mark Hough, another AEI employee, also testified that Morales told him that Diaz was involved in drug smuggling. Finally, Snyder testified that after Morales' own Lear Jet, N369MJ, was seized, Morales told Snyder that the Diaz who was wanted in Mexico was not their client and that Snyder should not mention Diaz to law enforcement.
 
 
 20
 Morales challenges the sufficiency of the government's evidence supporting each of the three prongs of the offense: (1) that the transaction involved drug proceeds, (2) that Morales knew that the funds were drug proceeds, and (3) that the transaction was designed at least in part to conceal or disguise the nature, location, source, ownership or control of drug proceeds. Because the government was not able to trace the purchase funds to a laundered account, the evidence is less compelling than that supporting the other laundering counts, but was nonetheless sufficient to support the jury's verdict.
 
 
 21
 A reasonable jury could have believed Morales' statements to Snyder and Hough about Diaz's drug dealing and in particular his assertion that the plane itself was used for drug trafficking. From this the jury could have inferred that the source of Diaz's wealth--Hough testified that Morales told him that Diaz had 68 houses in Mexico--was drug trafficking and that drug proceeds had paid for the plane. Because all the evidence of Diaz's drug trafficking came from statements Morales made to his own employees, this evidence was in turn more than sufficient to establish Morales' knowledge that the funds were drug proceeds.
 
 
 22
 The chief evidence regarding the third prong is that Diaz titled the plane in the name of his air-taxi service. This served both to avoid tariffs by hiding the plane's private ownership and, relevant here, to conceal the source of the purchase proceeds. As the Tenth Circuit noted in U.S. v. Garcia-Emanuel, 14 F.3d 1469 (10th Cir.1994), when it reinstated a jury verdict for money laundering against a drug dealer who purchased land with a cashier's check listing his restaurant as the remitter, the use of a legitimate corporation as the nominal purchaser "not only creates the false impression that the [legitimate business] was [the] source of wealth, but it creates documentary evidence in support of that deception that could mislead an investigator." Id. at 1476-1477.
 
 
 23
 In assessing Morales' knowledge and intent, the jury also could have considered more general evidence including Morales' statement to his friend and associate Kenneth Reed that he was doing business with his "cocaine cronies." Morales' involvement with Golb and Franco in the 1986 cash purchase of the Piper Navajo, in which he professed the desire to clean up more money through similar deals in the future, further bolstered the government's theory. The evidence on all three prongs was thus sufficient to support the jury's verdict.
 
 
 24
 B. Counts III and IV--Commander XBDSA and Lear Jet N369MJ
 
 
 25
 Counts III and IV charged Morales and Golb under both the "concealment" and "promotion" prongs of the money laundering statute. Acting on behalf of Franco and Air Caribe, Golb's Air North company arranged through Morales and AEI to purchase an Aero Commander with tail number XBDSA. Snyder testified that Morales told him that Franco was a good customer who had a large fleet of Aero Commanders in Colombia and was involved in the drug trade. There was also testimony that Aero Commanders were prized by drug traffickers because of their large payload, long range and ability to fly at high altitudes.
 
 
 26
 The purchase price for XBDSA was $1.1 million. On October 28, 1988, Golb delivered a cashier's check for $761,000 to Morales on behalf of Franco and Air Caribe as an initial payment on the plane. Morales paid Golb $10,000 to make the check out to Jervis Webb, who Morales claimed was a lienholder on the Commander. In fact, Webb was the owner of Lear Jet N369MJ which Morales was attempting to purchase for himself. Because Morales was about to default on his purchase deposit, he used the money from Golb to meet his payment obligations on the Lear Jet and could not purchase the Commander as agreed.
 
 
 27
 In November 1988, Golb began pressuring Morales to produce the Commander. Mark Hough testified that Golb told him two or three times that if Morales did not come up with the airplane, people "would come in and shoot everybody in the office and they wouldn't ask who was responsible or who wasn't responsible." [4/15/92 RT at 111-112]. According to Hough, Morales responded to these threats by saying: "Don't worry. They're just a bunch of Mafia people, and I have my own Mafia in Mexico if they come to hurt us. We'll--we can handle them." [4/15/92 RT at 113]. Snyder testified that Morales eventually acquired the Commander for Franco by selling a Lear Jet out of inventory at a loss of $250,000.
 
 
 28
 Both Morales and Golb challenge the sufficiency of the evidence connecting the purchase funds for the Commander to drug trafficking. The government's evidence was, however, more than sufficient. First, the government traced Air North's payments to AEI back to accounts fed by the Andonian and Sharir money laundering organizations. The evidence detailing the nature of these operations was more than ample for the jury to find that they existed to launder drug proceeds. Large volumes of low-denomination cash--found by dogs and chemists to be tainted with large amounts of cocaine--were delivered in duffle bags by men with beepers according to prearranged codes. The money was then used to purchase gold in unprofitable circular transactions producing checks or wire transfers to Panamanian, Mexican or Colombian banks.
 
 
 29
 In addition to this direct evidence of the nature of the proceeds, a DEA inspector testified that XBDSA was found in Mexico in December 1990 with no data plates, a false registration number, and a "clandestine fuel system," all consistent with its use in drug smuggling.
 
 
 30
 Golb challenges the government's evidence establishing the other required elements of the money-laundering charge, but these claims also fail. A jury could well have concluded from Golb's violent threats to Morales' employees that he was not representing legitimate businessmen. Golb's close relationship to his brother-in-law Franco, who according to Morales' statements to AEI employees was heavily involved in drug trafficking was additional evidence from which a reasonable jury could have concluded that Golb must have known of the source of the funds. Finally, the fact that the purchase funds came to Golb in the farm of multiple anonymous wire transfers from various banks in Panama and the United States and from bundles of checks drawn on different accounts, none in the name of Air Caribe or Franco, supports both Golb's knowledge of, and intent to conceal, the source of these funds. Golb claimed that the convoluted payment methods were only used to avoid Colombian currency exportation laws, but the jury did not have to accept his explanation.
 
 
 31
 Golb also challenges the sufficiency of the evidence that he intended to promote drug trafficking, but the jury reasonably could have concluded that Golb, a self-professed airplane expert, appreciated the Aero Commander's utility for drug trafficking as delineated by the government's expert. The jury thus reasonably could have concluded that Golb intended both to hide and to facilitate his brother-in-law's continued use of such planes for drug trafficking.
 
 C. Counts V and VI--Commander N9945S
 
 32
 Between July and October 1988, AEI received $1,900,000 for Aero Commander N9945S. Brenda Hough, the secretary at AEI, testified that Morales originally asked her to try to register the plane in Guatemala in the name of a dead person. Eventually, the plane was registered to Zuleta Trading, a Florida corporation owned by a Colombian man named Nestor Zuleta; AEI employees testified that the actual purchaser was Cuco Rodriguez. Mark Hough testified that Zuleta told him that his client, Cuco Rodriguez, was an upper-level Colombian drug trafficker and a member of a cartel.
 
 
 33
 Hough testified that the plane was delivered to Ricardo Londono in the Cayman Islands. Snyder testified that Morales told him that Londono was a Colombian aircraft broker with clients in the drug trade, and that Morales would not be surprised if some of the planes that he sold to Londono had later been seized with drugs on board.
 
 
 34
 Snyder also testified to an earlier incident involving Londono, when Morales had allegedly reneged on a debt stemming from an earlier deal with Londono and Rodriguez. According to Snyder's testimony, Londono sent three men to visit Morales at AEI's office, one of whom told Snyder that he would kill him and Morales and "do whatever he needed to get the money that was owed." [4/22/92 at 131]. Morales did not take this threat idly. He hired a "security expert" who took the office staff out in the desert and taught them to fire various semi-automatic weapons which were then kept at the office until the conflict was resolved.
 
 
 35
 Morales again challenges the sufficiency of the government's evidence establishing that the plane was purchased with drug proceeds. Again his challenge falls far short. If the testimony about Rodriguez and Londono's activities had been insufficient, which it was not, the fact that the government again traced the funds to accounts supplied by the Andonian money laundering organization more than adequately supports the jury's verdict.
 
 
 36
 D. Counts VII and VIII--Basler DC-3 Conversions
 
 
 37
 In 1988, Warren Basler was developing a DC-3 turbo prop conversion which replaced the outdated radial piston engines on those World War II vintage aircraft with lighter stronger turbine units. The conversion also included updated electronics, aerodynamic changes and a 40 inch stretch in the fuselage. The resulting aircraft retained the rugged cargo carrying capacity of the original DC-3, which accounted for the original plane's 50 plus years of use, and increased speed and range. These factors along with its ability to land on short unimproved airfields, made the Basler turbo conversion an enticing item for drug traffickers.
 
 
 38
 Before Basler had even received FAA approval for his conversion much less sold any aircraft, Burton Golb approached him seeking to purchase a total of six converted planes for his client Air Colombia. Golb and Basler reached a written agreement in September 1988. Between October 1988 and June 1989, $4,262,828 passed from Air Colombia through Air North to Basler. These funds were traced to 25 checks drawn on third-party accounts in Mexican banks and wire transfers from accounts fed through the two money laundering operations.
 
 
 39
 When Air Colombia fell behind on its payments Basler asked for more information on the company and its principals. Air Colombia declined to supply this information. In June 1989, after his brother-in-law Franco lost his position with Air Caribe, Golb lost all of his Air Colombia business including the Basler account. Air Colombia then turned to Ricardo Londono to finish the deal with Basler.
 
 
 40
 Londono in turn went to Caribbean Air and Marine Services ("CAMS") to replace Air North as intermediary to Basler and as exporter of the aircraft to Colombia. Unbeknownst to Londono, however, CAMS was in fact a fictitious business operated by the FBI as part of an undercover sting operation aimed at Londono's money laundering operations.
 
 
 41
 Golb's challenge to the sufficiency of the evidence supporting the jury's verdict on his brokering of the Basler conversions is unavailing. As with the other planes, the government established the drug proceeds element by tracing the funds to laundered accounts. Evidence that Air Colombia turned to Ricardo Londono after Golb was taken off the deal further supports the inference that the planes were purchased by drug traffickers for their trade.
 
 
 42
 Because Air Colombia and Air Caribe were controlled by the same individuals, Golb's threats against Morales and other AEI employees during the earlier Commander XBDSA transaction were equally probative of his knowledge of the source of the funds in DC-3 transactions and thus support the second prong of the statute. The jury also could have considered Golb's role in the earlier Piper Navajo purchase with Morales and Franco as evidence of his general familiarity with laundering money through aircraft deals. The evidence supporting Golb's intent to conceal the source of funds and promote drug trafficking was also essentially the same as that in Counts III and VI, including the unusual form of the funds Golb received from Air Colombia, his insistence that Basler undervalue the airplane for exportation and the plane's special suitability for drug trafficking.
 
 II. Joinder
 
 43
 Golb contends that his charges were improperly joined to those against Morales. Misjoinder of defendants under Federal Rule of Criminal Procedure 8(b) is a question of law reviewed de novo. United States v. Sanchez-Lopez, 879 F.2d 541, 550 (9th Cir.1989). Rule 8(b) provides that:
 
 
 44
 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
 
 
 45
 This rule "should be construed broadly in favor of initial joinder." United States v. Ford, 632 F.2d 1354, 1373 (9th Cir.), cert. denied, 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981). The charges against Golb and Morales were properly joined if they participated in the same series of acts or transactions constituting an offense or offenses. "The term 'transaction' is interpreted flexibly, and whether a 'series' exists depends on whether there is a 'logical relationship' between the transactions." United States v. Vasquez-Velasco, 15 F.3d 833, 843 (9th Cir.1994) (citations omitted). Joinder of charges against multiple defendants is particularly appropriate when the charges involve substantially overlapping evidence. Id. at 844.
 
 
 46
 Applying these standards to the present case, the money-laundering charges against Morales alone were clearly logically related to the counts involving Morales and Golb together and Golb alone. From at least the Navajo purchase in 1986, when Morales was still with Downtown, he and Golb appear to have had an ongoing business relationship. Morales was also involved in the counts which charged Golb alone: Morales flew Golb in his Lear Jet from Phoenix to Basler's development facility in Van Nuys, California, where the two toured the facility together. The two discussed the Basler conversions and Morales told Golb that he had interested clients. Golb, for his part, claimed falsely to be the exclusive South American distributor for Basler and asserted that Morales would have to work through him.
 
 
 47
 Moreover, all of the charged transactions occurred within a relatively short time period and involved a common cast of characters including Diaz, Londono, Rodriguez, and Franco. Various uncharged transactions further illuminate the connections between these parties and their various dealings. For instance, there was substantial evidence at trial concerning the sale of Commander XBECT from Diaz through AEI to Ricardo Londono acting as a broker for Franco. Franco's connections to Golb are obvious and substantial. The XBECT transaction thus completed the circle providing some connection between all the participants in each of the charged transactions.
 
 
 48
 Finally, a substantial portion of the evidence at trial involved the Andonian and Sharir organizations which were involved in all but one of the charged transaction (count II). This substantial evidentiary overlap between charges made joinder of the money-laundering counts all the more appropriate.
 
 
 49
 The only real issue is whether the drug-trafficking counts against Morales were "logically related" to the later money-laundering counts. Obviously the laundering of drug proceeds through the purchase of airplanes to smuggle drugs is logically related to drug smuggling. See United States v. Sanchez-Lopez, 879 F.2d 541 (9th Cir.1989) (joinder of drug and immigration charges was proper because illegal aliens could support themselves in this country and evade immigration laws by selling drugs). More directly, Morales' involvement in the charged drug smuggling stemmed from his role as an aircraft broker at Downtown Airpark. It was in this capacity and for the same people, his "cocaine cronies," that he later laundered money through AEI. Morales' drug smuggling was thus sufficiently logically related to his and Golb's later laundering of money through airplane sales to support joinder, and while it is true that Golb was not involved in Morales' smuggling, "[i]t was not necessary that all the appellants participate in every act constituting each joined offense." Id. at 551.
 
 
 50
 Golb contends that even if joinder under Rule 8(b) was proper, severance was required under Rule 14. Rule 14 provides in pertinent part:
 
 
 51
 If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election of separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.
 
 
 52
 Fed.R.Crim.P. 14. A district court's decision regarding whether to sever pursuant to Rule 14 is reviewed for an abuse of discretion. United States v. Vasquez-Velasco, 15 F.3d 833, 844 (9th Cir.1994). A defendant seeking reversal of the denial of a motion to sever bears the burden of proving that the prejudice was of such magnitude that he was denied a fair trial. Id. at 845-846. Golb has not come close to carrying this burden.
 
 
 53
 Keys in determining whether joinder was prejudicial are the degree to which the evidence was compartmentalized and the trial judge's diligence in instructing the jury on the purpose of the various types of evidence. Id. at 846. From our review of the record it is clear that both factors weigh against a finding of prejudice. Evidence pertaining to Morales' alleged drug smuggling occupied less than a week in the very beginning of the four-month trial, and the jury was repeatedly instructed not to consider any of that testimony against Golb. Throughout the trial, the court gave clear and repeated limiting instructions to the jury; the government scrupulously maintained this compartmentalization of the evidence during its closing argument. The district court thus did not abuse its discretion in denying Golb's motion for severance.[2]
 
 III. Venue
 
 54
 Golb challenges the venue for counts VII and VIII involving the Basler DC-3 conversions. We review de novo the legal question whether any part of the offense act occurred in the district of Arizona. United States v. Childs, 5 F.3d 1328, 1331 (9th Cir.1993), cert. denied --- U.S. ----, 114 S.Ct. 1385, 128 L.Ed.2d 60 (1994); 18 U.S.C. Sec. 3237; see United States v. Beddow, 957 F.2d 1330, 1336 (6th Cir.1992) (money laundering held to be a continuing offense cognizable under Sec. 3237(a)). The offense act, "conducting a financial transaction," is defined broadly to include "initiating, concluding, or participating in initiating, or concluding a transaction." 18 U.S.C. Sec. 1956(c)(2). The district court correctly found that Golb's trip with Morales from Phoenix, Arizona to Van Nuys, California to inspect the Basler factory and two phone calls from Golb to Morales in Phoenix concerning the Basler transaction provided a sufficient nexus between the transaction and the District of Arizona so that venue was proper.
 
 IV. Evidentiary rulings
 
 55
 Golb challenges several of the district court's evidentiary rulings. We review these only for abuse of discretion. United States v. Garcia-Orozco, 997 F.2d 1302, 1304 (9th Cir.1993).
 
 A. Purchase of Piper Navajo
 
 56
 As previously discussed, the district court admitted evidence of a 1986 cash purchase of a Piper Navajo by Golb, Franco and Morales. Golb told the seller that he was acting for Franco and agreed to pay a premium so that the purchase could be done with cash. The final payment was $200,000 in twenty dollar bills. Golb told the seller that the cash premium was "lower than they were used to paying, and that if we could do more business we could do millions of dollars of business." [5/12/92 RT at 45]. Golb also used the phrase "cleaning up money" in the context of possible future transactions. [5/12/92 RT at 51-52].
 
 
 57
 This evidence was properly admitted under Fed.R.Evid. 404(b) which allows the introduction of evidence of other wrongs to "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," to show Golb's knowledge that airplane purchases can be and are used to launder money. Moreover, the evidence sheds light on the relationship among Golb, Morales and Franco which is relevant to their later transactions.
 
 B. Post-indictment evidence
 
 58
 Golb also objected to the admission of several post-indictment events which were offered only to show that the purchase funds from Air Colombia and Air Caribe were drug proceeds.
 
 1. Subsequent history of Basler DC-3 deal
 
 59
 As discussed above, the government offered the testimony of an FBI agent that reputed drug figure Ricardo Londono attempted to enlist CAMS, a phony airplane brokerage firm operated as a sting by the FBI, to complete the Basler DC-3 deal for Air Colombia after Golb was removed. To the extent that Londono was in fact a drug figure, the fact that Air Colombia turned to him to finish the deal is probative both of Air Colombia's involvement in drug trafficking and of the link between that particular airplane deal and drug trafficking. The evidence was therefore properly admitted to establish that the funds used by Golb in the same deal were drug proceeds. The court instructed the jury that the evidence was only relevant to establishing the drug proceeds element and could not be considered with respect to Golb's state of mind. [5/27/92 RT at 161-62; 5/28/92 RT at 28-29]. There was no error.
 
 
 60
 2. Subsequent history of Aero Commander XBDSA
 
 
 61
 A Drug Enforcement Administration agent testified that in December 1990 he inspected an Aero Commander in Mexico with a serial number matching Aero Commander XBDSA, which as described above was acquired through Morales' and Golb's efforts. The plane had no data plates, a false registration number, and a clandestine fuel system. To the extent that such modifications are indicative of drug smuggling, the evidence tended to prove that the purchaser was involved in drug smuggling and thus that the purchase money came from drug proceeds. The evidence was properly admitted, particularly given the appropriate limiting instructions provided by the district court.
 
 
 62
 3. Chemical tests and dog sniffs of cash deposited with money launderers
 
 
 63
 The district court admitted expert testimony from a Drug Enforcement Administration chemist that cash processed by the Andonian money-laundering organization tested positive for cocaine. The court similarly admitted government testimony that dog sniffs had identified cocaine on money that was to be deposited in an account controlled by the Sharir money-laundering organization. None of the identified funds were traced directly to Air North or Golb, but purchase funds were traced from Golb to these two organizations. That this input cash was tainted with cocaine supports the government's claim that Andonian and Sharir were in the cocaine money-laundering business and thus that the purchase funds were also drug proceeds.
 
 
 64
 Golb contests the reliability of the tests and dog sniffs, and further argues that all money has cocaine on it. The government counters that these were no faint traces (like "flour in a bakery shop" according to the government's expert [6/2/92 RT at 120-21] and that the chemical tests used were more reliable than previous methods. In any case, in admitting the evidence, the district court did not abuse its discretion or violate Fed.R.Evid. 403, which allows for the exclusion of evidence if its probative value is substantially outweighed by the danger of unfair prejudice. The defense had its own expert who testified about experiments in which he detected cocaine on innocent sample bills; it was within the jury's province to resolve these competing opinions and determine what weight to accord the government's evidence.
 
 V. Jury Instructions
 A. Knowledge instruction
 
 65
 Defendants claim that the district court gave conflicting knowledge instructions. They did not object to these instructions at trial, however, and we review their contentions on appeal only for plain error. United States v. Gaudin, 28 F.3d 943, 951 (9th Cir.1994).
 
 
 66
 The money-laundering statute contains two different knowledge requirements. The government must prove that the defendant knew that the underlying acts which provided the source of the laundered proceeds were illegal. The government need not prove, however, that the defendant knew that his money-laundering acts were illegal. See United States v. Stein, 37 F.3d 1407, 1410 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1170, 130 L.Ed.2d 1124 (1995). Accordingly, the instructions in this case provided that:
 
 
 67
 [T]he government must prove ... the defendant knew that the property represented the proceeds of some form of unlawful activity.
 
 The court further instructed that:
 
 68
 An act is done knowingly if the defendant is aware of the act and does not act or fail to act through ignorance, mistake or accident. The government is not required to prove that the defendant knew that his acts or omissions were unlawful.
 
 
 69
 Relying on Stein, defendants argue that the court's general knowledge instructions negated the scienter element of the money-laundering offense. However, this case is entirely distinguishable from Stein. There the defendant was charged both with money laundering and with the underlying illegal acts, securities and wire fraud. The statement that "the government is not required to prove that the defendant knew his acts were unlawful" conflicted with the knowledge requirement of the money-laundering statute since the defendant's acts included the underlying act of fraud.
 
 
 70
 Here the defendants were not charged with the underlying acts of drug trafficking which produced the illegal proceeds. The only acts of the defendants to which the general knowledge instruction could be applied were their acts in laundering the money; the instructions, which did not require knowledge as to the illegality of these acts, were a correct statement of the law.[3]
 
 
 71
 B. Failure to instruct on elements of underlying drug offenses
 
 
 72
 Defendants also claim that the district court erred when it "refused to instruct the jury on the necessary elements of the predicate activity," i.e., drug trafficking. [Golb Br. at 4]. This argument is unavailing and the cases cited, e.g., United States v. Montoya, 945 F.2d 1068 (9th Cir.1991), do not support it. The jury was instructed "as a matter of law that the manufacture, importation, and distribution of controlled substances is a specified unlawful activity" and that the government had to prove that at least some of the funds involved represented the proceeds of the "manufacture, importation and distribution of controlled substances." [7/7/92 RT at 151, 156]. These instructions closely track those approved in United States v. Mickens, 926 F.2d 1323, 1330 (2d Cir.1991), cert. denied, 502 U.S. 1060, 112 S.Ct. 940, 117 L.Ed.2d 111 (1992). Because the drug trafficking which was the source of the proceeds was not part of the charged money-laundering offense, i.e., the drug traffickers were not on trial, the jury did not need to be further instructed. As this Court noted in analyzing a similarly constructed statute, the Travel Act, 18 U.S.C. Sec. 1952, the statutory language embodies all of the essential elements of the offense. United States v. Gordon, 641 F.2d 1281, 1284 (9th Cir.1981), cert. denied, 454 U.S. 859, 102 S.Ct. 312, 70 L.Ed.2d 156 (1981). See also United States v. Smith, 44 F.3d 1259, 1265 (4th Cir.1995) (details about the nature of underlying unlawful activity need not be alleged in indictment charging money laundering in violation of 18 U.S.C. Sec. 1957).
 
 VI. Brady violation and new trial motion
 
 73
 In an order dated October 13, 1994, the district court granted Morales a new trial on his drug conspiracy count based on the government's refusal, in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and its progeny, to turn over grand jury testimony of Aizprua, the key witness on the drug-trafficking counts. On November 12, 1987, Aizprua testified before a federal grand jury investigating former Panamanian President Manuel Noriega. Before the grand jury Aizprua testified that he flew money and drug-processing chemicals into Panama for Noriega. The district court granted Morales motion for a new trial on his drug conspiracy conviction, finding the grand jury testimony both "favorable" and "material" because Morales was nowhere mentioned even in the few passages which referred to Aizprua's drug trafficking. The district court reasoned that because Aizprua mentioned many of the same names that he disclosed at trial when discussing his drug trafficking but "failed to mention Mr. Morales until Mr. Morales himself was on trial," the evidence was exculpatory. [New Trial Order at 10]. The district court also placed substantial weight on the fact that Kosonoy, who had access to a redacted version of Aizprua's testimony, was subsequently acquitted.[4]
 
 
 74
 At the same time, the court determined that because Aizprua's testimony was essentially unrelated to Morales' later money laundering for which substantial other evidence had been introduced, "that disclosure of the grand jury material would not have made a different decision as to the money laundering counts 'reasonably probable.' " [New Trial Order at 9].
 
 
 75
 Because the government has since dismissed the drug conspiracy charge, the only issue on appeal is the district court's determination that the government's failure to disclose the grand jury testimony did not necessitate a new trial on Morales' money laundering counts. The ultimate question is whether there "is a reasonable probability that had the material been disclosed, the result of the proceeding would have been different such that confidence in the outcome is undermined." United States v. Lai, 944 F.2d 1434, 1440 (9th Cir.1991), cert. denied, 502 U.S. 1062, 112 S.Ct. 947, 117 L.Ed.2d 116 (1992); Kyles v. Whitley, --- U.S. ----, ----, 115 S.Ct. 1555, 1566, 131 L.Ed.2d 490 (1995).
 
 
 76
 After reviewing the trial record, as well as Aizprua's grand jury testimony and DEA debriefings, our confidence in the jury's verdict is in no way undermined. First, despite the district court's decision to grant Morales a new trial on the drug charge, Aizprua's grand jury testimony does not significantly undermine his testimony at trial. Second, even if Aizprua's testimony were completely obliterated, it would in no way undermine our confidence in the money-laundering verdicts.
 
 
 77
 In his grand jury testimony, Aizprua briefly described his drug trafficking including flights made for Cuco Rodriguez. He also described meeting Kosonoy during the same time period, but did not discuss his smuggling flights for Kosonoy's group from Colombia to Mexico, to which Morales' drug charges related. This omission is neither surprising nor suspicious, however, because those flights did not relate to Noriega, and Aizprua was neither questioned specifically about them nor asked to catalog his complete history of drug trafficking.
 
 
 78
 The defendants and the district court found Aizprua's failure to mention Morales most telling and exculpatory in the following exchange:
 
 
 79
 Q: Now, sir, did there come a time when Floyd Carlton Cacerez got you involved in flying narcotics?
 
 
 80
 A: Yes, Sir.
 
 
 81
 Q: And did you and Floyd Carlton Cacerez become involved with a gentleman by the name of Cabellero?
 
 
 82
 A: Yes, Sir.
 
 
 83
 Q: And anyone else in the narcotics business?
 
 
 84
 A: A gentleman by the name of Miguel Aleman. Some gentlemens from Colombia and Mexico by the name of Luis Sarsay, Leopoldo Rodriguez, both from Colombia, and William Muncado from Mexico, and John Jose Quintero, uncle of Carlo Quintero, and Dr. Fidel Konsonoy.[5]
 
 
 85
 The six names listed by Aizprua do not include Daniel Morales. Nor, however, do they include a number of Aizprua's other drug-trafficking acquaintances. The list simply is not exhaustive. The questioner appears to be asking with whom, beyond Cabellero, Aizprua and Floyd Carlton Cacerez were involved? If so, the list may only include those who were also associates of Cacerez. In any event, Morales' omission from this partial list is probative of little. Perhaps because Morales was in the United States, did not own the drugs involved and was still employed by Downtown, Aizprua did not consider him a principal like Cuco Rodriguez or Fidel Kosonoy.
 
 
 86
 Moreover, in Aizprua's October 2, 1986, DEA debriefing--more than a year before his grand jury testimony and over five years before Morales' trial--Aizprua gave a detailed account of his drug trafficking and his dealings with Morales (to whom he refers dozens of times) that is completely consistent with his trial testimony. In light of this debriefing, any attempt by the defense to impeach Aizprua with his Noriega grand jury testimony would have been futile. The consistency of his trial testimony with his debriefing, given less than a month after his arrest, obliterates the defense's argument that Aizprua manufactured Morales' involvement at the behest of the government on the eve of trial.[6]
 
 
 87
 Even if the grand jury testimony could somehow have decimated Aizprua's trial testimony, it would not undermine our confidence in the jury's verdicts on the money-laundering counts. Aizprua testified for three days at the very beginning of this four-month trial. His testimony related only to the drug charges and did not concern any of the transactions involved in the money laundering counts. In fact, Aizprua had been arrested years before any of those events.[7]
 
 
 88
 The only possible "crossover effect" of Aizprua's testimony on Morales' money-laundering convictions would be to buttress the "knowledge of the illegal source of funds" element. If Morales were himself a drug trafficker, it would be more likely that he was aware that his customers were drug traffickers and were purchasing planes with drug money. The prosecution, however, never suggested this inference. In its closing argument, the prosecution carefully compartmentalized the drug-trafficking and the money-laundering evidence and never suggested that any of Aizprua's testimony was relevant to the latter charges. Moreover, as discussed above in Part I, there was more than sufficient direct evidence for the jury to conclude that Morales knew who and what he was dealing with.[8]
 
 VII. Sentences
 
 89
 In calculating the defendants' sentences the district judge added nine to each defendant's offense level pursuant to U.S.S.G. Sec. 2S1.1(b)(2)(J), based on his finding that each defendant laundered over $10 million. Defendants challenge this figure. We review the district court's finding for clear error, United States v. Howard, 894 F.2d 1085, 1087 (9th Cir.1990), and find none.
 
 
 90
 In calculating the "value of funds" laundered under the Sentencing Guidelines, the district court must consider conduct beyond the counts on which the defendant was convicted where the acts "were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. Sec. 1B1.3(a)(2); United States v. Rose, 20 F.3d 367, 371 (9th Cir.1994). Morales, through AEI, received over $10 million from Roberto Franco, Ricardo Londono and Baltazar Diaz between March 1988 and June 1989 for aircraft transactions including those charged in the money-laundering counts. Because the uncharged transactions were for the same customers, during the same time period, and otherwise similar to those for which Morales was convicted, the district court did not clearly err in including the whole $10 million in his sentencing calculation.
 
 
 91
 Golb, through Air North, received over $10 million in deposits from Air Colombia and Air Caribe between June 1988 and June 1989. At trial a large chunk of this money was traced to the Andonian and Sharir laundering operations; more than half was used for the charged transactions. The rest was used for the purchase of aircraft maintenance and parts for Air Caribe and Air Colombia. The district court, therefore, did not clearly err in finding that these too were laundering transactions involving drug proceeds and including the whole $10 million in calculating Golb's sentence.
 
 
 92
 Golb also challenges the district court's denial of his requested two level reduction as a minor participant under U.S.S.G. Sec. 3B1.2 and the court's imposition of a $20,000 fine. Neither claim has merit or merits discussion. Golb was not a minor participant, and the district court provided for Golb's alleged inability to pay the fine by allowing him to pay it in installments during and after his incarceration.
 
 
 93
 AFFIRMED.
 
 
 
 *
 Honorable Walter J. Cummings, United States Circuit Judge for the Seventh Circuit, sitting by designation
 
 
 [1]
 See Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)
 
 
 [2]
 Golb also argues that severance was required because his and Morales' defenses to counts III and IV were antagonistic, and that in a separate trial, Morales would have provided exculpatory evidence or in the alternative Golb could have argued that Morales' silence was inculpatory of Morales and at the same time exculpatory of Golb. These arguments, which border on nonsensical, find no support in the record or Golb's cited authority
 
 
 [3]
 The district court's good faith defense instruction would have mitigated any potential confusion (though none should have arisen); moreover, even if the jury perceived the instructions to be inconsistent, the only possible prejudicial effect would have been to relieve the government of the minuscule burden of proving that the defendants knew drug trafficking was illegal
 
 
 [4]
 A review of the transcript of the defense's cross-examination of Aizprua in Kosonoy's trial suggests that the district court's reliance on Kosonoy's subsequent acquittal was misplaced. The defense never directly referred to Aizprua's Noriega grand jury testimony and only briefly touched on Aizprua's admitted involvement in flying money and chemicals for Noriega. Given Aizprua's extensive history of illegal activity, these additional bad acts would have had only incremental impeachment effect. More importantly, the defense never suggested that the grand jury testimony was inconsistent with Aizprua's trial testimony in either Kosonoy's or Morales' trials. Therefore, whatever led to the different outcome in Kosonoy's trial, it was almost certainly not the defense's access to Aizprua's Noriega grand jury testimony
 
 
 [5]
 Inexplicably, this exchange is misquoted in the district court's order granting Morales a new trial:
 Q: Now, sir, did there come a time when Floyd Carlton Cacerez got you involved in flying narcotics?
 A: Yes, sir.
 Q: And anyone else in the narcotics business?
 [New Trial Order at 11]. The middle question and answer are left out which gives the final question a broader scope, i.e., "were you involved with anyone else in the narcotics business?" rather than "were you and Floyd Carlton Cacerez involved with anyone else?"
 
 
 [6]
 The debriefing would presumably be admissible for this purpose as a prior consistent statement under Fed.R.Evid. 801(d)(1)(B)
 
 
 [7]
 Aizprua incidentally mentioned a proposal by Morales to cooperate to launder money and sell planes in the future. The joint venture never happened and the prosecution did not inquire further into it [RT 3/11/92 at 162]
 
 
 [8]
 Golb joined Morales' motion for a new trial based on the alleged Brady violation. Because Aizprua's testimony had nothing to do with Golb, the district court properly denied his motion as well