[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 04-13977

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUL 10, 2006
THOMAS K. KAHN
CLERK

D. C. Docket No. 03-00033-CR-5-MCR-01

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DAVID E. MARTINELLI,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

**(July 10, 2006)**

Before DUBINA, MARCUS and COX, Circuit Judges.

MARCUS, Circuit Judge:

David Martinelli appeals from his conviction after a jury trial and the

ensuing 210-month prison sentence for conspiring to launder money in violation of

18 U.S.C. §§ 1956(a)(1) and (h).  Martinelli claims that the district court should have suppressed certain evidence, that it erred in its jury instructions and at sentencing.  After thorough review, we affirm the conviction but remand for resentencing in light of United States v. Booker, 543 U.S. 220 (2005).

## I.

The basic facts developed at trial in this money laundering conspiracy case are these.  In 1995, Martinelli and two associates formed Global Business Services, Inc. ("GBS"),[1] a corporation purportedly designed to facilitate the sale of small businesses by putting hopeful sellers in contact with willing buyers.  GBS would randomly send letters to small-business owners, attempting to locate those who were interested in selling their business.  When a potential seller responded, a GBS representative would meet with the client and gather information about the business.  The representative would explain that GBS placed generic advertising in national publications representing that it had businesses for sale; when interested buyers responded, GBS would attempt to match them with compatible sellers.

A seller was required to sign a contract whereby it agreed to pay GBS a certain percentage of the total value of the business in exchange for the advertising.

---

[1]The business underwent several name changes, including Worldwide Business Services, Inc. and International Business Associates.  For convenience, we use GBS throughout, except where it is necessary to differentiate between the various entities.

Donald Cox, the original President and CEO of GBS, testified for the government at trial that clients had to immediately pay a small percentage, "around 2 percent," and then an additional "5 to 7 percent" if the business actually sold. The government also presented evidence of initial fees ranging from $1,900 to $16,900. The contracts stated that GBS would provide advertising until the business sold, but did not guarantee an actual sale. Mr. Cox stayed with GBS for slightly under twelve months and testified that, during this time, GBS did not facilitate the sale of a single business.

Cox also testified concerning numerous misrepresentations made by GBS. Thus, for example, he said that GBS sent direct mailings to small-business owners with testimonials from allegedly satisfied customers describing how GBS helped to sell their businesses. In fact, there were no such customers, and the people pictured in the representations were actually Martinelli and other GBS employees. Cox also described how GBS represented in its mailings to putative sellers that all of its buyers were prequalified to ensure they had the financial ability to purchase a business when, in fact, such screening was discontinued soon after GBS was formed. Moreover, Cox testified that GBS touted that it used a sophisticated computer matching system to bring together compatible buyers and sellers. Actually, at least initially, GBS had no computers at all, and all buyers and sellers

3

were manually logged in record books.[2]

The government also presented the testimony of over 100 witnesses at trial, many of whom were businesspeople who signed contracts with GBS in hopes of selling their companies. They generally testified to receiving the false mailings, which advertised previously successful sales and a sophisticated computer matching system, and to the manner they were subsequently treated by Martinelli and other GBS employees. Various sellers said that a GBS employee who visited with them recounted the many sales GBS had facilitated in the past and predicted a "quick sell" for the business at hand. Many of the sellers never received any "match" at all, and those who did often found that the person purportedly interested in their business did not exist, had never heard of GBS, had no interest in buying a business, or was interested in a wholly unrelated kind of business. Indeed, sellers were given contact names of fictitious GBS employees and Martinelli placated those who complained by sending them bogus matches. As one GBS employee testified, there was "very little" emphasis on securing buyers because "our income was coming from" the sellers. In fact, the evidence established that GBS arranged the sale of only <u>one</u> business between 1995 and 2000, and even that sale occurred only after an ambitious GBS employee scoured

---

[2]A computer system was eventually created. A GBS employee testified that the system was "never 100 percent finished" and that "there was room to improve."

the phone book and randomly located a buyer for a seller's trash company.

Carl Carr, an indicted co-defendant and GBS operations manager and vice president, pled guilty and also testified for the government. Carr described the fraud at GBS in great detail. He explained that the defendant, Martinelli, employed fake names in GBS correspondence to avoid being recognized as having a role in the organization and to make it appear as if GBS had a large and stable workforce. Martinelli also knowingly placed false statements in GBS mailings, including assurances that buyers would be financially prequalified and promises of a sophisticated computer matching system, all designed to induce sellers to sign a contract with GBS. Carr confirmed that there was no sophisticated computer matching system and that the testimonials from satisfied customers were entirely false. He observed that GBS sales representatives were told of past successes because "[w]e wanted them to think that we were a reputable business and that we were doing what we said we were doing."

Moreover, Carr described how Martinelli falsified documents (including the application)[3] submitted to the Better Business Bureau so that GBS could become a

---

[3]Carr testified that the Better Business Bureau requires its member companies to have been in business for at least two years. Because Martinelli could not satisfy that requirement, he and Carr created and submitted a sham commercial lease, which indicated that GBS had been renting office space since 1982. Moreover, Martinelli falsely stated on the application form that GBS had been in business, at the same location, for fifteen years. Carr testified that he and Martinelli felt that if GBS were a member of the Better Business Bureau, people "would think that we were . . . legitimate and reliable."

member of that organization and then tout its membership to prospective customers. Finally, Carr confirmed that Martinelli was well aware of the fraudulent activities at GBS, stating that Martinelli personally wrote many of the fraudulent mailings and knowingly engaged in the fraudulent practices to induce customers to sign with GBS.

The government also presented testimony regarding the money that was generated from the fraudulent activities. Among other things, GBS employees testified that when a seller submitted payment after signing a contract, that money was generally deposited into one of several GBS-controlled bank accounts. The money in those accounts was then used to fund the underlying scheme to defraud. Thus, for example, Martinelli used the fraudulently-derived proceeds to pay for more fraudulent brochures and mailings, which would, in turn, then be sent to additional potential customers, thereby generating still more illegal proceeds. Evidence was also presented that Martinelli and his family used funds drawn on GBS accounts for personal expenditures such as clothing for Mrs. Martinelli and cellular phone service for Martinelli's children.[4]

The government also presented evidence that GBS moved funds between

[4]There were also bank accounts (such as the "A-O Trust" accounts) that, although not specifically designated with the name of one of Martinelli's businesses, were used to receive client payments, pay business expenses, and fund personal expenditures (such as checks for meals and jewelry).

6

various accounts under the guise of "loans" to and from GBS, even though the "loaned" money belonged to GBS in the first place. Thus, for example, GBS funds were deposited into a trust fund controlled by Martinelli, withdrawn via a check made out to cash, converted into a cashier's check, and then redeposited into a GBS account as the proceeds of a "loan." All told, between 1995 and 2000, some $6.6 million was deposited into bank accounts controlled by Martinelli and at least 1,521 customers of GBS were identified.[5]

A jury found Martinelli guilty of one count of conspiracy to launder money. He now challenges the district court's refusal to suppress certain evidence procured from several search warrants, the failure to give certain requested jury instructions, and his sentence.

## II.

By early April of 2000, GBS had become World Business Services, Inc. ("WBS"), WBS had filed for bankruptcy, and Martinelli had re-opened his venture under the name International Business Associates ("IBA"). On April 12, 2000, investigators with the Bay County Sheriff's Office executed search warrants issued by a state judge at the former business location for WBS and the business location

---

[5]Additionally, Carl Carr testified that GBS established a special bank account to accept proceeds from credit card sales. Immediately after the funds were deposited from the credit card company, they would be transferred to a different account. In this way, there would never be funds available for the credit card company if a customer successfully disputed a charge.

for IBA. More than one year later, a United States magistrate judge issued a federal warrant for computers seized during those searches.

Martinelli moved to suppress the proceeds recovered from both the state and federal warrants. The district court conducted an evidentiary hearing, and ultimately ruled that (1) the state search warrants were supported by probable cause; (2) the state search warrants were not overbroad in failing to describe with particularity what was to be seized; (3) Martinelli was not entitled to a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978); (4) even if the warrants had been deficient, the evidence still would not be suppressed because of the "good faith exception" to the exclusionary rule; (5) the federal warrant was not tainted by any improprieties found in the state warrants; and (6) Martinelli did not have Fourth Amendment "standing" to challenge the WBS search in the first place. Martinelli challenges each of those rulings.

First, Martinelli says that the affidavits used in support of the applications for the state search warrants failed to establish probable cause. In reviewing a district court's ruling on a motion to suppress, we review findings of fact for clear error and the application of the law to those facts de novo. United States v. Muegge, 225 F.3d 1267, 1269 (11th Cir. 2000); see also United States v. Jiminez, 224 F.3d 1243, 1248 (11th Cir. 2000) (noting that we review de novo whether

8

there was probable cause to support a search warrant, although "we must take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers" (internal quotation marks omitted)).

The affidavit supporting the WBS search warrant alleged, among other things, that the affiant, Investigator Steve Harbuck, was contacted in March of 2000 by Loving Enterprises, a business in Tampa. The complainant business claimed that it had been defrauded by WBS of approximately $4,000. Loving Enterprises further stated that other businesses had been similarly defrauded. This caused Harbuck to begin investigating WBS. He learned that WBS was owned and operated by David Martinelli and that the "nature of [WBS] was to advertize businesses for sale, and help locate buyers for said businesses."

In April of 2000, Harbuck received a list from the Better Business Bureau detailing some twenty-three complaints filed against WBS. Harbuck said that he verified the information in the list by calling "several" of the complainants, each of whom indicated that they had contracted with WBS in an effort to sell their business and that, although WBS collected an initial fee from them, it never subsequently performed <u>any</u> services. Harbuck said that he received "several" similar complaints against WBS from businesses throughout the United States,

9

each of which averred that WBS collected a fee but provided no services in return. Harbuck traveled to the WBS location in Panama City Beach, where a building management representative told him that WBS vacated the office suite on March 31, 2000, but had left behind numerous files and related office equipment. The affidavit observed that "[b]usiness related files and correspondence, employee files, [and] computer software and hardware" belonging to WBS would be found at the location, and that those items would be evidence of the "ongoing scheme to defraud."

The IBA affidavit was similar to the WBS affidavit. However, it added that Martinelli formed IBA, which assumed all of the contracts of WBS. Harbuck said that "[t]he material provided by [IBA] states that the operation of their business is identical to the business that was operated by [WBS]."

Martinelli argues that the affidavits fail to set forth probable cause because they are "silent as to the basis of knowledge of any of the individuals or entities or their veracity or reliability." Martinelli analogizes the information received from the Better Business Bureau to that of a confidential informant and argues that the affidavit does not establish the veracity or the foundation for an informant's information. See United States v. Brundidge, 170 F.3d 1350, 1352-53 (11th Cir. 1999) (noting that the "veracity" and "basis of knowledge" are two factors to

10

consider in determining whether, under the totality of the circumstances, an informant's tip provides probable cause). The district court correctly rejected this argument. Although the affidavit does not specifically name the twenty-three businesses or individuals listed on the report from the Better Business Bureau, or the specific names of the complainants the officer contacted, those people and entities were neither anonymous nor confidential. Indeed, the affiant officer actually contacted several of them. Plainly they were not unknown. They were simply named victims of a crime who relayed information to the police.

The courts have traditionally viewed information drawn from an ordinary witness or crime victim with considerably less skepticism than information derived from anonymous sources. See, e.g., Easton v. City of Boulder, 776 F.2d 1441, 1449 (10th Cir. 1985) (noting that "the skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim or ordinary citizen witness"). Each of the victims had personal knowledge of the crimes; they had done business with WBS. Moreover, there was a high level of corroboration. Each of the complainants Harbuck spoke with reported that they paid money for the same purpose, but, notably, never received any services. Finally, the affidavit, which was submitted in April of 2000, refers to recent complaints or allegations

11

that had been recently verified.  See Jiminez, 224 F.3d at 1249 (noting that even stale information can provide probable cause when the government "updates, substantiates, or corroborates the stale material" (internal quotation marks omitted)).

"Probable cause to support a search warrant exists when the totality of the circumstances allow a conclusion that there is a fair probability of finding contraband or evidence at a particular location."  Brundidge, 170 F.3d at 1352. Here, the affiant relied on personal information from many victims.  Harbuck observed the offices and described the materials that would provide evidence of the fraud.  Quite simply, there was a "fair probability" that contraband would be found at the locations described, and the warrants were supported by probable cause.

Martinelli also contends that the warrants were overbroad because they permitted the seizure of "all" business files and because they failed to sufficiently describe the crimes that were committed.  See, e.g., United States v. Travers, 233 F.3d 1327, 1329 (11th Cir. 2000) (noting that a "warrant which fails to sufficiently particularize . . . the things to be seized is unconstitutionally over broad").  Again, we review the district court's findings of fact for clear error and its application of law to those facts de novo.  Muegge, 225 F.3d at 1269.

Although the Fourth Amendment requires that a warrant sufficiently

12

particularize the things to be seized, we have held that the government may seize all of the business records of an enterprise engaged in a "pervasive scheme to defraud." United States v. Sawyer, 799 F.2d 1494, 1508 (11th Cir. 1986). In Sawyer, we upheld a warrant authorizing the seizure of all of the business records of an enterprise where there was substantial evidence from twenty-five customers detailing various fraudulent activities. The fraudulent conduct employed in twenty-five separate instances made it "probable" that the company was using identical misleading and fraudulent techniques with other customers. Id. Here, the affiant had a list of twenty-three Better Business Bureau complainants, the communication from Loving Enterprises, and several other similar complaints lodged by different small-business owners, all alleging precisely the same kind of fraud. Here, there were allegations of a "pervasive scheme" to defraud sufficient to justify the seizure of all company documents. Id. at 1508-09; see also Travers, 233 F.3d at 1330 (noting that cases involving "complex financial fraud justify a more flexible reading of the fourth amendment particularity requirement" (internal quotation marks and alterations omitted)); United States v. Hooshmand, 931 F.2d 725, 736 n.12 (11th Cir. 1991) (rejecting argument that a search warrant should have been limited to the files of the particular patients identified in the supporting affidavits because there was a "pervasive scheme to defraud" (internal quotation

13

marks omitted)).

Martinelli also challenges the breadth of the warrants because they do not identify the crimes that Martinelli allegedly committed. However, the affidavits, which the district judge found were attached to the warrants, describe the fraud in some detail by noting that WBS fraudulently took money from customers although it failed to provide them with any services. When affidavits are attached to a warrant, we will consider the affiant's statements in determining whether the warrant sufficiently identifies the crimes that were allegedly committed. Cf. United States v. Bridges, 344 F.3d 1010, 1018-19 (9th Cir. 2003) (finding a search warrant overly broad because it did not describe the crime allegedly committed and the more descriptive affidavits were not attached). The affidavits sufficiently detailed the alleged crimes and the affidavits were attached to the warrants. The warrants were not overbroad.[6]

---

[6]We readily dispose of Martinelli's remaining arguments concerning the searches. As for his Franks claim, we agree with the district court that Martinelli failed to meet his burden of showing that Harbuck omitted material facts or made materially false statements in the affidavits, much less that he did so intentionally, knowingly, or recklessly. See United States v. Novaton, 271 F.3d 968, 986-87 (11th Cir. 2001) (noting that to prevail on a Franks claim, a defendant must show, among other things, that the affiant knowingly or recklessly made the alleged misrepresentations or omissions). Next, the district court determined that Martinelli did not have "standing" to challenge the WBS search. In order to avoid confusion with Article III standing, the Supreme Court has observed that "the definition of [Fourth Amendment] rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Minnesota v. Carter, 525 U.S. 83, 88 (1998) (internal quotation marks omitted). We agree with the district court that Martinelli had no constitutionally protected privacy interest in the items taken during the WBS search because: 1) the lease had expired for the WBS office, giving the landlord the right to reenter and take possession, and 2) the bankruptcy trustee had

14

**III.**

Martinelli also claims the district court erred in refusing to instruct the jury regarding: (1) the elements of mail fraud; (2) good faith; (3) materiality; (4) mere puffing; (5) the theory that all expenditures do not qualify as promotion transactions; and (6) the theory that merely spending money does not amount to concealment. "We review a district court's refusal to give a requested jury instruction for abuse of discretion." United States v. Carrasco, 381 F.3d 1237, 1242 (11th Cir. 2004).

> A district court's refusal to give a requested instruction is reversible error if (1) the requested instruction was a correct statement of the law, (2) its subject matter was not substantially covered by other instructions, and (3) its subject matter dealt with an issue in the trial court that was so important that failure to give it seriously impaired the defendant's ability to defend himself.

Id. (internal quotation marks omitted).

Martinelli was indicted for conspiring to launder money pursuant to 18

---

specifically told Martinelli that he could not touch or remove any of the items that remained in the WBS office. See id. (noting that "to claim the protection of the Fourth Amendment, a defendant must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable"); United States v. McKennon, 814 F.2d 1539, 1543 (11th Cir. 1987) (holding that "[w]hether an individual possesses a constitutionally protected privacy interest depends upon the totality of circumstances"). Finally, we conclude that the federal warrant was not in any way tainted, because there were no constitutional deficiencies in the foundational state search warrants. Inasmuch as we have sustained the district court's ruling on multiple grounds, we have no occasion to address the trial court's conclusion that even if the warrant was otherwise defective, the good faith exception to the exclusionary rule enunciated by the Supreme Court in United States v. Leon, 468 U.S. 897 (1984) would sustain the searches and seizures.

15

U.S.C. §§ 1956(a)(1) and (h).[7]  Section 1956(a)(1) provides that:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity –

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or
(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part–

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or
(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

---

[7]Specifically, the indictment alleged that between March 1, 1995 and August 31, 2000, Martinelli and two co-defendants

did knowingly combine, conspire, confederate, agree and have a tacit understanding with each other and with other persons to engage in and attempt to engage in financial transactions affecting interstate commerce, which financial transactions involved the proceeds of a specified unlawful activity, that is, mail fraud in violation of Title 18, United States Code, Section 1341, knowing that these transactions were designed in whole or in part: (a) to promote the carrying on of a specified unlawful activity; and (b) to conceal and disguise the nature, location, source, ownership and control of the proceeds of said specified unlawful activities; and that while conducting and causing to be conducted such financial transactions, the defendants knew that the property involved in the transactions represented the proceeds of some form of unlawful activity.

16

Section 1956(h) makes it illegal to conspire to commit a crime defined in, inter alia, section 1956(a)(1).

We glean several important points from the plain language of section 1956. First, the government can prove, and in this case attempted to prove, two different kinds of money laundering: "intent to promote" money laundering pursuant to section 1956(a)(1)(A)(i), and "concealment money laundering" pursuant to section 1956(a)(1)(B)(i). Second, both "intent to promote" and "concealment money laundering" require the existence of an underlying "specified unlawful activity." The statute defines a "specified unlawful activity" to encompass numerous federal crimes, including all of those set forth in 18 U.S.C. § 1961(1), see 18 U.S.C. § 1956(c)(7)(A), which lists "racketeering activities" under the RICO statute. For our purposes, it is sufficient that the indictment alleged the "specified unlawful activity" of mail fraud, in violation of 18 U.S.C. § 1341, and that mail fraud is listed as a "racketeering activity" in section 1961(1).

"To obtain a conviction for a . . . money laundering conspiracy . . . the government bears the burden of proving beyond a reasonable doubt that: (1) two or more persons agreed to commit a crime, in this case a . . . money laundering violation; and (2) that [the defendant], knowing the unlawful plan, voluntarily joined the conspiracy." United States v. Johnson, 440 F.3d 1286, 1294 (11th Cir.

17

2006). See also United States v. Alerre, 430 F.3d 681, 693-94 (4th Cir. 2005) (noting that the government has to prove that "(1) a conspiracy to commit promotion money laundering was in existence, and (2) that during the conspiracy, the defendant knew that the proceeds used to further [the] illicit operations had been derived from an illegal activity, and knowingly joined in the conspiracy"), cert. denied, 126 S. Ct. 1925 (2006); United States v. Threadgill, 172 F.3d 357, 366 (5th Cir. 1999) ("The elements of the offense of conspiracy to commit money laundering are: (1) that there was an agreement between two or more persons to commit money laundering; and (2) that the defendant joined the agreement knowing its purpose and with the intent to further the illegal purpose.").

First, Martinelli says that the district court erred by failing to instruct the jury on the basic elements of mail fraud, the "specified unlawful activity" underlying the alleged money laundering conspiracy. He argues that mail fraud is a "core element of the offense." Martinelli urges that the district judge should have given Eleventh Circuit Criminal Pattern Jury Instruction 50.1, which sets forth four elements for mail fraud: (1) that the defendant knowingly devised or participated in a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises; (2) that the false or fraudulent pretenses, representations or promises related to a material fact; (3) that the

18

defendant acted willfully and with an intent to defraud; and (4) that the defendant used the United States Postal Service or a private or commercial interstate carrier by mailing or depositing (or causing to be mailed or deposited) some matter or thing for the purpose of executing the scheme to defraud. Moreover, Martinelli says that the district court erred by failing to define the terms "scheme to defraud," "false," "fraudulent," and "material fact," all of which are defined in pattern jury instruction 50.1.

The government responds that Martinelli failed to raise this issue before the district court and therefore we should review for only plain error. See United States v. Hasson, 333 F.3d 1264, 1277 (11th Cir. 2003). After thoroughly reviewing the record, we cannot find where Martinelli specifically asked the district judge to instruct on the elements of mail fraud. There is no such request in his proposed jury instructions, and we have been unable to locate any verbal request in the trial transcript. Indeed, Martinelli's attorney conceded at oral argument that he did not request the mail fraud pattern jury instruction (which sets forth the elements of mail fraud) or an instruction defining "scheme to defraud." Therefore, we review this issue only for plain error. Id.

"An appellate court may not correct an error the defendant failed to raise in the district court unless there is: (1) error, (2) that is plain, and (3) that affects

substantial rights." United States v. Rodriguez, 398 F.3d 1291, 1298 (11th Cir.) (internal quotation marks omitted), cert. denied, 125 S. Ct. 2935 (2005). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." Id. (internal quotation marks omitted).

The lack of an instruction on the elements of mail fraud was not error because, as we explain in greater detail below, Martinelli was not charged with mail fraud and the government did not have to prove he committed mail fraud to convict him of conspiring to launder money. See, e.g., United States v. Magluta, 418 F.3d 1166, 1174 (11th Cir. 2005). Had the district court given the pattern mail fraud instruction, it would have incorrectly told the jury to decide whether the defendant, Martinelli, "knowingly devised or participated in a scheme to defraud," "acted willfully with an intent to defraud," and "used [the United States mails] for the purpose of executing the scheme to defraud." Eleventh Circuit Criminal Pattern Jury Instruction 50.1. In fact, the government did not have to prove any of those elements; Martinelli simply had to know the funds were derived from the specified unlawful activity of mail fraud. See 18 U.S.C. § 1956(a)(1). The pattern mail fraud instruction, which details the affirmative actions a defendant must

undertake to violate the mail fraud statute, simply does not apply in a money laundering conspiracy case, where the defendant need only have knowledge that the funds were derived from mail fraud.

But even if the district court erred by not giving the pattern instructions on mail fraud (which it did not), that error was surely not plain. The district court's instructions are nearly identical to those we recently affirmed under plain error review in another money laundering conspiracy case involving the same specified unlawful activity of mail fraud. See United States v. Silvestri, 409 F.3d 1311, 1337 n.17 (11th Cir. 2005). In Silvestri, just as in this case, the defendant failed to ask the district judge to instruct the jury on the elements of mail fraud. We held that the trial court did not plainly err by simply telling the jury that the mail fraud statute "makes it a crime or offense for anyone to use the Unites States mails in carrying out a scheme to defraud." Id. (internal quotation marks omitted). We noted that the term "defraud" is "well within the common understanding of the jury and therefore need not be defined." Id. (internal quotation marks omitted).

If anything, the district judge in the Martinelli case provided a more detailed instruction on the specified unlawful activity of mail fraud than the one we considered in Silvestri. Indeed, here the district court actually paraphrased the language of the mail fraud statute for the jury:

21

The term specified unlawful activity here as set out in the indictment means mail fraud. Mail fraud is that crime as defined in Title 18 of the United States Code, Section 1341 as the use of the United States mails for transmitting something by private or commercial interstate carrier in carrying out a scheme to defraud. For purposes of these instructions, it is not important whether the defendant used the mail himself or rather that someone used either the United States Postal Service or some private mail carrier in furtherance of the scheme to defraud as set out in the indictment.

Thus, the district judge provided the jury with a description of mail fraud that closely tracks the language of 18 U.S.C. § 1341, without incorrectly telling the jury that Martinelli had to commit mail fraud. The district court's instructions are consistent with Silvestri, and we have been unable to find any money laundering conspiracy case that required jury instructions on the elements of the specified unlawful activity. There was no error, plain or otherwise. See United States v. Aguillard, 217 F.3d 1319, 1321 (11th Cir. 2000) (noting that "an error cannot meet the 'plain' requirement of the plain error rule unless it is clear under current law" (internal quotation marks omitted)).

Additionally, the lack of an instruction on the elements of mail fraud did not prejudice Martinelli, let alone affect his substantial rights. The jury was fully instructed on the elements of conspiring to launder money, and the district judge made clear that Martinelli had to know the proceeds were derived from the specified unlawful activity of mail fraud. Thus, the absence of instructions on the

22

elements of mail fraud, which were not elements of the charged crime, did not affect Martinelli's rights. For similar reasons, the lack of an instruction on the elements of mail fraud did not seriously affect the fairness, integrity, or public reputation of the judicial proceeding.

Martinelli did, however, specifically request jury instructions on one of the elements of mail fraud -- materiality -- and, therefore, we review whether the failure to instruct on that element was an abuse of discretion. Not surprisingly, we conclude again that the trial court did not abuse its discretion by refusing to instruct on materiality because Martinelli was not charged with mail fraud. It is by now abundantly clear that in a money laundering case (or in a money laundering conspiracy case), the defendant need not actually commit the alleged specified unlawful activity. See Magluta, 418 F.3d at 1174 (noting that the government did not have to prove that a defendant charged with laundering and conspiring to launder money committed the underlying felony drug offenses); United States v. DeLaMata, 266 F.3d 1275, 1292 (11th Cir. 2001) ("A conviction for money laundering does not require proof that the defendant committed the specific predicate offense."); see also United States v. Awada, 425 F.3d 522, 525 (8th Cir. 2005); United States v. Smith, 46 F.3d 1223, 1234 (1st Cir. 1995).[8] Indeed, if the

_____

[8]As the Fourth Circuit explained, "[i]t is clear that a defendant may be convicted of money laundering even if she is not a party to, much less convicted of, the specified unlawful

23

district court had instructed as the defendant requested, that any misrepresentation "must be shown by the government with proof beyond a reasonable doubt to be a 'material' misrepresentation," the jury would have incorrectly assumed that it had to find Martinelli violated the materiality element of the substantive mail fraud offense. That is simply not the law.

Moreover, this case is similar to United States v. Golb, 69 F.3d 1417 (9th Cir. 1995). In Golb, the defendant was charged with the substantive offense of laundering money derived from the specified unlawful activity of drug trafficking. Id. at 1429. The Golb jury "was instructed 'as a matter of law that the manufacture, importation, and distribution of controlled substances is a specified unlawful activity' and that the government had to prove that at least some of the funds involved represented the proceeds of the 'manufacture, importation and distribution of controlled substances.'" Id. The Ninth Circuit rejected the

---

activity." United States v. Cherry, 330 F.3d 658, 667 (4th Cir. 2003). This is evident from an examination of cases where a defendant was charged with both money laundering (or conspiracy to launder money) and a substantive violation of a specified unlawful activity, was acquitted of the charge related to the underlying crime, yet convicted of money laundering. See, e.g., United States v. Richard, 234 F.3d 763, 768-69 (1st Cir. 2000) (affirming money laundering conviction even though defendant had been acquitted on the substantive charge of bankruptcy fraud, which was also the specified unlawful activity used to support the laundering charge). Finding a defendant guilty of laundering while acquitting on a count charging substantive violations of the specified unlawful activity is logically consistent because laundering "does not require proof that the defendant committed the specified predicate offense, it merely requires proof that the monetary transaction constituted the proceeds of a predicate offense." Id. at 768. Again, Martinelli only had to "know[] that the property involved . . . represent[ed] the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1).

defendant's argument that the trial judge erred by refusing to instruct on all the elements of drug trafficking, holding that "[b]ecause the drug trafficking which was the source of the proceeds was not part of the charged money-laundering offense, i.e., the drug traffickers were not on trial, the jury did not need to be further instructed." Id.; cf. United States v. Lomow, 266 F.3d 1013, 1017 (9th Cir. 2001) (finding that the district judge did not violate Federal Rule of Criminal Procedure 11 by failing to inform the defendant of the elements of mail fraud when accepting his guilty plea on counts of money laundering and conspiracy to launder money). In reaching that conclusion, the Ninth Circuit relied in substantial measure on cases involving a federal statute with a parallel structure and similar language, the Travel Act, 18 U.S.C. § 1952.[9]

More particularly, the basic structure of the Travel Act is similar to the money laundering statute because it too criminalizes a certain act (traveling in interstate commerce or using the mail or any facility in interstate commerce) done

_____

[9]The Travel Act makes it illegal to:

travel[] in interstate or foreign commerce or use[] the mail or any facility in interstate or foreign commerce, with intent to --

(1) distribute the proceeds of any unlawful activity; or
(2) commit any crime of violence to further any unlawful activity; or
(3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity.

18 U.S.C. § 1952(a).

25

with the intent to distribute the proceeds of "any unlawful activity."  18 U.S.C. § 1952(a)(1).  Section 1952 lists a number of predicate crimes that qualify as unlawful activities, including "extortion, bribery, or arson" in violation of state or federal law.  Id. § 1952(b)(2).  Because both the Travel Act and the money laundering statute criminalize actions undertaken with knowledge of an underlying "unlawful activity," the Travel Act cases are relevant and persuasive.

Thus, for example, in United States v. Conway, 507 F.2d 1047 (5th Cir. 1975), the former Fifth Circuit in binding precedent[10] squarely rejected a defendant's argument that the trial judge erred by refusing to instruct the jury on the definition of arson under Maryland law when that was the predicate offense underlying a Travel Act conviction.  The court held that "proof of the violation of the [underlying unlawful activity] to which reference is made for purposes of prosecution under [the Travel Act] is not an essential element to be proved in such a federal prosecution."  Id. at 1051.  The former Fifth Circuit opined that

> "[a]rson" is a commonly used and understood word.  There was sufficient evidence upon which the jury could find that the appellant traveled in interstate commerce with intent to bomb and/or burn a Maryland building.  There is no requirement that the jury be instructed on the Maryland definition of arson and there is no reversible error here.

---

[10]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), we adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Id. at 1051-52; see also United States v. Owens, 159 F.3d 221, 228 (6th Cir. 1998)

(finding that the district court did not plainly err by failing to instruct the jury on

the elements of the predicate state law offenses in a Travel Act case where the trial

judge did read the statutory definitions of the underlying crimes); United States v.

McNeal, 77 F.3d 938, 944-45 (7th Cir. 1996) (concluding that the trial court "fairly

and accurately conveyed to the jury the issues before it" by defining the underlying

crime in a Travel Act case by quoting from the Illinois intimidation statute); Cf.

United States v. Gallo, 782 F.2d 1191, 1194-95 (4th Cir. 1986) (reversing a Travel

Act conviction where the district judge failed to define, in any fashion, the term

"unlawful activity").

The district judge did tell the jury no less than four times that the defendant

had to know the proceeds were derived from mail fraud. She instructed the jury

that the government had to prove beyond a reasonable doubt that

> while conducting and causing to be conducted such financial
> transactions, the defendant and others knew that the property involved
> represented the proceeds of some form of unlawful activity. . . . The
> defendant may be convicted of conspiracy on your finding beyond a
> reasonable doubt that the defendant knew that the proceeds of the
> specified unlawful activity of mail fraud were designed in whole or in
> part to either promote or to conceal in the proceeds of the mail fraud
> or both. . . . Money laundering to promote the carrying on of a
> specified unlawful activity means that the defendant knowingly
> conducted or attempted to conduct a financial transaction knowing
> that the funds or property involved in the financial transaction
> represented the proceeds of some form of unlawful activity. . . .

27

> Money laundering designed . . . to conceal or disguise the nature, location, source, ownership or control of the proceeds of the specified unlawful activity means that the defendant knowingly conducted or attempted to conduct a financial transaction <u>knowing</u> that the funds or property in the financial transaction represented the proceeds of some form of unlawful activity. . . .

(emphasis added).

Thus, the district court, without specifically defining "materiality," expressly told the jury that the "specified unlawful activity" in this case involved the use of the United States mails in carrying out a scheme to defraud. No more was required of the trial court.[11]

Moreover, Martinelli has not shown that the trial court's refusal to instruct on materiality -- even if this was somehow erroneous -- seriously impaired his ability to defend himself, and that standing alone would be fatal to his argument. The kinds of misrepresentations in this case (i.e., falsely advertising completed sales, satisfied customers, and financially-qualified buyers) were anything but immaterial -- they went to the heart of the business services Martinelli offered. <u>See</u> <u>United States v. Neder</u>, 197 F.3d 1122, 1128 (11th Cir. 1999) (noting that a statement is material if it "has a tendency to influence or is capable of influencing a

---

[11]Furthermore, it is not at all clear that, even if the elements of mail fraud were somehow construed as elements of the crime of conspiring to launder money, that it would have been appropriate to instruct the jury on <u>only</u> materiality without also instructing on the other elements of mail fraud. <u>Cf.</u> <u>United States v. Miller</u>, 22 F.3d 1075, 1080 (11th Cir. 1994) (noting that "[i]t is well established that the trial court has the obligation to instruct the jury on <u>all</u> the essential elements of the crime charged" (internal quotation marks omitted)).

decision" and finding harmless the district court's failure to instruct on materiality in a mail, wire, and bank fraud case).

Next, Martinelli argues that the district court erred in refusing to instruct on the defense of good faith. Martinelli requested this instruction before the district court and, therefore, we review it for abuse of discretion. The government conceded at trial that an instruction on a good faith defense would have been appropriate if there were any facts to support it. The government argued, however, that there was no factual support for a good faith instruction, and the district court agreed. Specifically, the district judge said:

> Well, I agree with the government. There's been no evidence
> submitted here in this trial of any good faith on Mr. Martinelli's part
> himself, and if there had been, then I agree with you, Mr. Samuel, that
> the threshold would be low as to the amount of evidence that would
> need to be presented in order for this instruction to be given, but
> there's just been flat no evidence of good faith on the part of Mr.
> Martinelli himself. So this instruction will also not be given.

The district court correctly observed that the threshold burden a defendant must satisfy to have an instruction on his theory of defense is "extremely low: The defendant is entitled to have presented instructions relating to a theory of defense for which there is any foundation in the evidence." United States v. Ruiz, 59 F.3d 1151, 1154 (11th Cir. 1995) (internal quotation marks and alterations omitted). Although the government put forth voluminous and substantial evidence from

29

many witnesses establishing the fraudulent nature of Martinelli's business, we cannot agree that there was "flat no evidence" of good faith. Although the government presented evidence that Martinelli focused almost exclusively on the sellers, there was also testimony that he hired at least a small number of representatives to deal with the buyers. Indeed, one GBS employee testified that Martinelli wanted him "to do everything possible to see that these businesses got sold." And, while it appears that the computer matching system never actually worked as it was supposed to, there is some evidence that Martinelli hired at least one person to try to make it more efficient. Because the district judge was required for the purposes of this instruction to view the evidence in a light most favorable to the defendant, see id., we disagree with her finding that Martinelli presented no evidence of good faith.

That finding does not mean, however, that Martinelli has sustained his burden of showing that the district judge committed reversible error. See United States v. Sirang, 70 F.3d 588, 594 (11th Cir. 1995) ("[F]ailure to give the proffered instruction on good faith is not per se error [because] we must examine the facts of the case to determine the adequacy of the instructions as a whole and the effect of the omission on the defendant's case."). The second prong of our analysis then requires us to ask whether the subject matter of the requested instruction was

30

"substantially covered by other instructions."  United States v. Carrasco, 381 F.3d 1237, 1242 (11th Cir. 2004).

Although the district judge did not instruct that "good faith" was a complete defense to mail fraud, she did tell the jury repeatedly -- as we have noted already -- that Martinelli had to know the money represented the proceeds of the specified unlawful activity of mail fraud.  The trial judge then stated that the term

> "knowing that the funds or property involved in the financial transaction represented the proceeds of some form of unlawful activity" means that the defendant knew that such funds or property involved in the transaction represented proceeds from some form, though not necessarily which form of activity that constitutes a felony offense under state or federal or foreign law.

Moreover, the district court defined "knowingly" to mean "that the act was done voluntarily and intentionally and not because of accident or mistake."  Based on those instructions, the jury plainly had to rule out the possibility that Martinelli actually harbored a good-faith belief in the legitimacy of the business before it could have found that he knew the money represented proceeds of mail fraud.  In other words, based on the instructions the district judge gave, if the jury concluded that Martinelli had a good-faith belief in the legitimacy of the business, it could not have found that he knew the funds were the proceeds of mail fraud.  See United States v. Giraldi, 86 F.3d 1368, 1376 (5th Cir. 1996) (finding no abuse of discretion in the lack of instruction on good faith where the district court

31

incorporated the idea of good faith by instructing on specific intent, willfully, and knowingly); United States v. Rochester, 898 F.2d 971, 978-79 (5th Cir. 1990) (finding no reversible error where the trial court refused to instruct on good faith, but did instruct on the definition of willfully and intent to defraud).[12]

Additionally, and even more basic, Martinelli cannot carry his burden on the third prong of this analysis because the trial court's failure to instruct on good faith did not seriously impair his ability to defend himself. See Carrasco, 381 F.3d at 1242. Unlike the situation we found in Morris, the evidence of fraud in this case

---

[12]Moreover, we are not persuaded that our decision in United States v. Morris, 20 F.3d 1111 (11th Cir. 1994), compels a different outcome. In Morris, the defendant was charged with filing false income tax returns and with conspiring to defraud the United States by filing false and fraudulent income tax returns. The government had to prove that the defendant did so willfully, i.e. he did not accidently file the returns believing them to be accurate. The defendant argued that he did not realize the returns were incorrect and requested a good faith instruction. The trial court refused. Instead, it instructed the jury that the defendant had to willfully file the returns, but then did not incorporate into its definition of willful that such a state of mind would preclude a mistake or accident. We held that because the concept of a mistaken or accidental filing was not incorporated into the court's instructions, it was reversible error to refuse the defendant's request for instructions on good faith. Id. at 1117-18. Moreover, we noted that the particular instruction was especially important because, unlike with most criminal statutes, a mistake of law (even an unreasonable mistake) was a defense to the tax offense at issue. Id. Finally, we noted in Morris that the defendant was prejudiced by the refusal to instruct on good faith because the evidence against him was limited and circumstantial while the evidence supporting the proffered defense was "substantial." Id. at 1118.

Unlike Morris, the district judge in this case made it abundantly clear that the defendant had to act knowing that the money represented the proceeds of mail fraud. The trial court defined "knowing" and "knowingly" in such a way that the jury could not have found that the defendant knew the proceeds were derived from mail fraud if it also found that the defendant was operating a legitimate and non-fraudulent business. Thus, because the good faith defense was essentially incorporated into the court's overall jury instructions, we cannot find an abuse of discretion.

32

was overwhelming and the evidence of good faith was slight.  Moreover, Martinelli's attorney actually argued good faith to the jury in his closing, urging the jury to believe that Martinelli "was a salesman just like millions of good salesmen in this country who had a good faith belief that he could build a business. His intent was not criminal."  See Giraldi, 86 F.3d at 1376 (considering the extent to which the defendant was able to argue good faith to the jury, even in the absence of a specific good faith instruction).  Although it would have been wiser to instruct on the defense of good faith, the district court's failure to do so was not an abuse of discretion because the charge was essentially encompassed in other parts of the jury instructions and its absence did not prejudice Martinelli to the extent that it seriously impaired his ability to defend himself.  See United States v. Frazier, 387 F.3d 1244, 1259 (11th Cir. 2004) (en banc) (noting that "under the abuse of discretion standard of review there will be occasions in which we affirm the district court even though we would have gone the other way had it been our call" (quoting Rasbury v. I.R.S. (In re Rasbury), 24 F.3d 159, 168 (11th Cir. 1994))).

Martinelli also argues that the district judge should have instructed on the defense of "mere puffing."  We have recognized that "puffing" or "sellers' talk" is not actionable under the mail fraud statute.  See United States v. Brown, 79 F.3d 1550, 1557 (11th Cir. 1996) (noting that "statements that company 'nationally

33

known' and that product 'among the finest . . . in the world' are 'not cognizable under the federal mail fraud statute'" (quoting United States v. Pearlstein, 576 F.2d 531, 540 n.3 (3d Cir. 1978))).  Here, the trial judge refused to instruct on the "puffing" defense, noting that the evidence "cannot in any stretch be characterized as mere puffery or just a sales pitch."  We agree.

The misrepresentations in this case were not exaggerated opinions or hyped-up sales pitches.  See Mfg. Research Corp. v. Greenlee Tool Co., 693 F.2d 1037, 1040 (11th Cir. 1982) (describing puffing, in the context of a common law unfair competition claim, as "an expression of opinion not made as a representation of fact").  Instead, they were factual statements that were verifiably refutable.  Thus, the assertion that all buyers would be prequalified was simply untrue -- GBS stopped prequalifying buyers early in the scheme.  Also, the brochure showing Martinelli and other GBS employees as satisfied customers was patently false -- they had not sold businesses through GBS, and, to the extent that a customer from the one completed sale in five years may have been satisfied, there is no evidence he or she ever provided a testimonial for use in GBS advertising.  Martinelli does not direct us to a single allegedly fraudulent act that fairly could be considered "puffing," and we have been unable to locate any during our own review of the record.  The district court did not abuse its discretion in refusing to instruct on the

34

defense of "puffery" because there was no evidence in support of such a defense.

Next, Martinelli says that the trial judge erred by refusing to instruct the jury that, as to the promotion theory of money laundering, "making payments for business expenses, such as payroll expenses, payroll taxes, rent and other normal business expenses does not amount to 'promoting the carrying on of specified criminal activity.'" The trial judge refused to give the proffered request, noting that she did not "recall evidence of payment of ordinary business expenses such as rent, payroll, and taxes as are indicated and specified in the proposed instruction, and if there was any such evidence, it was minimal." Moreover, the district judge said that "even if my recollection of the evidence is inaccurate, I think that there is a risk with this instruction that the jury would be confused . . . about what constitutes a legitimate business expense."

Martinelli is correct in observing generally that the government must demonstrate the financial transaction was conducted or attempted "with the intent to promote the carrying on of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(A)(i); accord United States v. Calderon, 169 F.3d 718, 722-23 (11th Cir. 1999) (reversing money laundering convictions because there was "no evidence indicating how the money was to be spent"). Other circuits have developed a line of cases standing for the proposition that a defendant may not be

convicted of promotion money laundering "where the proceeds of some relatively minor fraudulent transactions are used to pay the operating expenses of an otherwise legitimate business enterprise." United States v. Miles, 360 F.3d 472, 477 (5th Cir. 2004) (internal quotation marks omitted). "On the other end of the factual spectrum, however, are cases where, when a business as a whole is illegitimate, even individual expenditures that are not intrinsically unlawful can support a promotion money laundering charge." Id. at 478 (internal quotation marks and alterations omitted). Martinelli has not cited a single case, however, where the issue of legitimate business expenses was ever discussed in jury instructions. Rather, each of the cases cited by Martinelli involved a challenge to the sufficiency of the evidence.

Moreover, we need not address whether Martinelli's proffered instruction was a correct statement of the law because, even if it were, the subject matter of the charge was substantially covered by other instructions.[13] The district judge correctly stated that "[m]oney laundering to promote the carrying on of a specified

_____

[13]The trial judge did note that if she were to give Martinelli's requested instruction, she would then also have to instruct that legitimate business expenses could be the basis for a money laundering conspiracy if the entire business was fraudulent. See Miles, 360 F.3d at 478. The district judge worried that these instructions would confuse the jury, and we agree. The question of whether the expenses were "legitimate" depends exclusively on the extent to which the jury felt the business as a whole was legitimate. This entirely factual inquiry would have become even more confusing if the judge had attempted to define, as a matter of law, the types of expenses that could or could not be considered "legitimate."

36

unlawful activity means . . . that the defendant engaged in the financial transaction with the intent to promote the carrying on of such specified unlawful activity." Additionally, the trial judge used the Eleventh Circuit Pattern Jury Instructions to charge that "[t]he term with the intent to promote the carrying on of the specified unlawful activity means that the defendant must have conducted or attempted to conduct the financial transaction for the purpose of facilitating or making easier or helping to bring about the specified unlawful activity as has been defined."  See Eleventh Circuit Criminal Pattern Jury Instruction 70.1.  Thus, the trial judge properly instructed that the financial transaction had to be conducted or attempted with the intent to promote the mail fraud.  Based on those instructions, the jury could not have found Martinelli guilty if it believed the financial transactions were undertaken for legitimate, non-fraudulent business expenses.  The requested charge was substantially covered in other instructions.  Furthermore, Martinelli has completely failed to demonstrate that the failure to give this requested instruction seriously impaired his ability to defend himself.

Finally, Martinelli argues that the district court erred in refusing to instruct the jury that:

> With regard to the "conceal or disguise the nature, the location, the source, or the control of the proceeds" element of the money laundering statute, I instruct you that merely "spending" money does not amount to money laundering, even if the money is derived from

37

criminal activity. In order to constitute money laundering, the defendant must have had the specific intent to conceal money that was generated from criminal conduct. Moreover, the evidence of "concealment" must be substantial.

The trial judge instructed that

> [m]oney laundering designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the specified unlawful activity means . . . that the defendant engaged in the financial transaction knowing that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership or control of the proceeds of the specified unlawful activity of mail fraud."

Thus, the jury could not have found the defendant guilty without first determining that he knew the transactions were designed to conceal or disguise. The requested instruction was substantially covered in other parts of the charge; there was no abuse of discretion. Just as with the other requests, we are fully satisfied that the trial court's failure to give this charge did not seriously impair Martinelli's ability to defend himself.

**IV.**

Martinelli also says the district court erred at sentencing by using facts neither admitted by him nor found by the jury in determining the amount of loss and in imposing a four-level adjustment for his role in the offense. Martinelli raised a constitutional objection at sentencing based on the Supreme Court's decision in Blakely v. Washington, 542 U.S. 296 (2004), and the Sixth

38

Amendment. The district judge ruled that the Sentencing Guidelines were constitutional and declined to impose an alternative sentence.

The government correctly acknowledges that this was error in light of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005). When a district court commits constitutional Booker error, the government must prove beyond a reasonable doubt "that the mandatory, as opposed to the advisory, application of the guidelines did not contribute to the defendant's sentence." United States v. Davis, 407 F.3d 1269, 1271 (11th Cir. 2005). The government concedes that it cannot sustain its heavy burden. After independent review we agree and, therefore, vacate Martinelli's sentence and remand to the district court for resentencing in light of Booker.[14]

## V.

In short, we conclude that the district court did not err in refusing to suppress evidence or in charging the jury. Accordingly, we affirm Martinelli's conviction. However, the district court did commit constitutional Booker error that was not harmless. We vacate Martinelli's sentence and remand for resentencing.[15]

---

[14]Martinelli summarily argues that the district court erred in determining the amount of money for which he was held responsible and in determining that he was an organizer or leader pursuant to U.S.S.G. § 3B1.1(a). Because we have vacated the sentence, we have no occasion to review those contentions now.

[15]Martinelli moved for release pending appeal. In light of our ruling affirming his conviction, that motion is **DENIED**.

**AFFIRMED IN PART; VACATED AND REMANDED IN PART**.

COX, Circuit Judge, specially concurring:

I join the court's opinion except for the discussion relating to the jury instruction on mail fraud. Martinelli contends that the district court erred by failing to give an instruction informing the jury of the elements of mail fraud. The court finds that Martinelli failed to preserve the error he now alleges because he did not submit such an instruction at trial. I agree, and therefore also agree that the court's failure to give such an instruction must be reviewed under our plain error test. However, in performing the plain error review, the majority opinion decides much more than it must. The court holds that the lack of an instruction on the elements of mail fraud: (1) did not seriously affect the fairness, integrity, or public reputation of the judicial proceedings, (2) did not affect Martinelli's substantial rights, (3) was not plain error, given our precedent, and (4) was not error at all. I agree with the first three of these holdings. Therefore, I concur in the result. I write separately to express my disagreement with the court's holding that the district court did not err in instructing the jury.

It is true, as the court states, that it would not have been error for the district court to refuse to give the pattern instruction on mail fraud. Martinelli was not charged with mail fraud. And, the Government did not have to prove (as the pattern instruction requires) that Martinelli himself committed mail fraud to prove

41

the charged crime of conspiracy to launder monies resulting from mail fraud. But Martinelli does not contend that he was entitled to the pattern instruction; he contends that he was entitled to an instruction informing the jury of the elements of mail fraud. Appellant's Opening Br. at 13-15, 18-20. I agree.

I acknowledge that, in *United States v. Silvestri*, after finding that the defendant in that case had invited any error in the jury instructions and therefore was not entitled to appellate review of them, this court went on to hold that the district court did not err by giving an instruction that only cursorily described mail and wire fraud, the "specified unlawful activities" in that money laundering conspiracy case.[1] 409 F.3d 1311, 1337-38 n.17 (11th Cir. 2005). That holding in *Silvestri*, though unnecessary to the resolution of the case and confined to a footnote, nevertheless dictates the result in this case. *Johnson v. DeSoto County Bd. of Comm'rs*, 72 F.3d 1556, 1562 (11th Cir. 1996) ("[W]e are bound by alternative holdings."); *McLellan v. Mississippi Power & Light Co.*, 545 F.2d 919, 925 n.21 (5th Cir. 1977) ("It has long been settled that all alternative rationales for a given result have precedential value."). But, our precedent and common sense counsel that, on that point, *Silvestri* is wrongly decided.

---

[1]In *Silvestri*, the district court told the jury that 18 U.S.C. § 1341, "makes it a federal crime or offense for anyone to use the United States mails in carrying out a scheme to defraud," and that 18 U.S.C. § 1343 "makes it a federal crime or offense for anyone to use an interstate wire communications facility in carrying out a scheme to defraud." *Silvestri,* 409 F.3d at 1326.

In *United States v. Martinez*, 496 F.2d 664 (5th Cir. 1974), a case in which

the defendants were tried for conspiracy to import marijuana and conspiracy to

possess marijuana with intent to distribute, the court held that the jury charge was

plainly erroneous because it failed to "apprise [the jurors] of the definition,

character or nature of the acts of importing, possessing, or distributing marijuana."

*Id*. at 669. Thus, *Martinez* requires that the district court tell the jury the essential

character of the object of a conspiracy. Here, the object of the conspiracy was

money laundering. But, it was not the laundering of just any monies. Rather, it

was the laundering of monies generated by the unlawful activity specified in the

indictment– mail fraud.

The text of the money laundering statute itself tells us that this is an

important distinction. In pertinent part, the statute reads:

> Whoever, knowing that the property involved in a
> financial transaction represents the proceeds of some
> form of unlawful activity, conducts or attempts to
> conduct such a financial transaction <u>which in fact
> involves the proceeds of specified unlawful activity</u>--
>     (A)(i) with the intent to promote the carrying on of
> specified unlawful activity; or
>        . . . .
>     (B) knowing that the transaction is designed in
> whole or in part--
>         (i) to conceal or disguise the nature, the
> location, the source, the ownership, or the control of the
> proceeds of specified unlawful activity;[]
>           . . . .

> shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1) (emphasis added).

When, in *United States v. Miller*, 22 F.3d 1075 (11th Cir. 1994), we considered the appeal of a defendant who was convicted of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i), we found error in the money laundering jury instruction because it mistakenly identified a different "specified unlawful activity" from that charged in the indictment, an unlawful activity that had different elements. We described the instruction as "clearly flawed," and explained that "a conviction was warranted only if the jury found beyond a reasonable doubt that the checks in question were proceeds from the federal offenses specified in the indictment." *Id.* at 1079. Thus, *Miller* tells us that, in a money laundering case, when a jury is asked to find beyond a reasonable doubt that the laundered funds were proceeds of the "specified unlawful activity" alleged in the indictment, the jury must be instructed correctly what that "specified unlawful activity" is.

In this case, the jury was told that the "specified unlawful activity" was mail fraud, but it was never told exactly what mail fraud is. The jury instructions included this brief description of mail fraud:

> Mail fraud is a crime as defined in Title 18 of the United

44

States Code, Section 1341 as the use of the United States mails [or] transmitting something by private or commercial interstate carrier in carrying out a scheme to defraud. For purposes of these instructions, it is not important whether the defendant used the mail himself or rather that someone used either the United States Postal Service or some private mail carrier in furtherance of the scheme to defraud as set out in the indictment.

The jury in this case was required to find, beyond a reasonable doubt, that: (1) the funds Martinelli allegedly conspired to launder were proceeds of mail fraud, and (2) Martinelli had either intent to promote the carrying on of mail fraud or knowledge that the money laundering transactions were designed to conceal the proceeds of mail fraud. I do not believe it could do so absent an instruction that stated the elements of mail fraud.

To the extent *Silvestri* concludes otherwise, it is wrongly decided. In proclaiming that the district court's brief descriptions of mail and wire fraud were enough to apprise the jury of the "specified unlawful activity" in that case, *Silvestri* completely ignores *Martinez* and *Miller* and fails to explain how a jury could make the required findings. *Silvestri* relies on the well-accepted premise that terms within the common understanding of the jury need not be defined in the jury instructions. But it extends that rule too far. *Silvestri* cites no authority to support its holding that "defraud" and "promote" are legal terms "well within the common understanding of the jury" and therefore need not be defined. 409 F.3d at 1338

45

n.17 (internal quotation omitted). And, even accepting that assertion as true, by focusing on these terms alone, *Silvestri* answers the argument that the jurors may not have understood mail fraud and wire fraud– the alleged sources of the monies intended to be laundered– by reducing those crimes to just two words. *Silvestri* says that because jurors understand "defraud" and "promote," jurors also understand what mail fraud and wire fraud mean without being told. Therefore, *Silvestri* reasons, no jury charge defining those crimes is necessary.[2] *Id.*

This holding in *Silvestri* and its application in this case threaten a defendant's right to a jury verdict of guilt beyond a reasonable doubt because they place too much faith in jurors' common understanding. When a "specified unlawful activity" is complicated, like mail fraud, a cursory description of it cannot suffice. The jury should be told the essential character of the unlawful activity that yielded the monies allegedly intended to be laundered. Here, the jury had to find, beyond a reasonable doubt, that the monies Martinelli was charged with laundering arose out of a crime, during which someone (not necessarily Martinelli): (1) used the mails, (2) as part of willful participation in, (3) a scheme to defraud others by making false or fraudulent representations or promises, (4) related to material

---

[2]If this holding that mail fraud and wire fraud are within the common understanding of jurors is correct, then it must also be true that a defendant charged with mail fraud or wire fraud is not entitled to have the jury instructed on the elements of that offense. That cannot be the law.

facts.[3]  The jury also had to find that Martinelli conspired to engage in money laundering either with intent to promote the use of the mails for this purpose or with knowledge that he was acting to conceal monies generated by the use of the mails for this purpose.  These are not simple determinations, and the defendant has a right to have the court give the jury detailed guidance.

The problem inherent in giving just a cursory description of the "specified unlawful activity" is highlighted when we consider Martinelli's contention that a good faith jury instruction should have been given.  Martinelli argued at trial that the money he allegedly conspired to launder was not the proceeds of any fraud but rather the profits of a legitimate business.  In support of that defense, Martinelli requested a jury instruction that good faith is a defense to mail fraud and, in this case, money laundering.  The court's opinion reasons that, even though there was some evidence of good faith, the district court's refusal to give the good faith instruction was not an abuse of discretion, in part because the district court told the jury that Martinelli had to know that the money he allegedly conspired to launder

<hr />

[3]The majority opinion misleadingly asserts that the Government did not have to prove any of the elements of mail fraud.  While it is true that the Government did not have to prove that Martinelli himself engaged in behavior satisfying each of the elements of that crime, the Government did have to prove, beyond a reasonable doubt, that the monies it accused Martinelli of conspiring to launder were, in fact, proceeds of mail fraud.  *See* 18 U.S.C. § 1956(a)(1).  Thus, the Government had to prove that mail fraud (including all its elements) was committed and generated those monies.

47

was the proceeds of unlawful activity. But that instruction did not tell the jury that, in order for the monies to be the proceeds of mail fraud, someone had to have willfully made false representations of material facts for the purpose of defrauding others. Martinelli's proposed instruction regarding good faith was targeted at this element of conspiracy to commit money laundering–whether the monies intended to be laundered were actually the proceeds of mail fraud or whether they were the proceeds of innocent representations. So, once again, the questions go unanswered: Without being told exactly what mail fraud is, how could the jury find, beyond a reasonable doubt, that the monies Martinelli conspired to launder were proceeds of mail fraud? And, how could the jury find, beyond a reasonable doubt, that Martinelli conspired to launder the monies with the intent to promote mail fraud or with knowledge that the money laundering transactions were designed to conceal the proceeds of mail fraud?

I concur in the result in this case because, given *Silvestri*, the jury instructions in this case cannot be found deficient. Nevertheless, I think they were deficient. And, I am convinced that *Silvestri* was wrongly decided.

48