[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 18, 2010
JOHN LEY
CLERK

No. 09-13731
Non-Argument Calendar
_____

D. C. Docket No. 08-00053-CR-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

RAMON AGUIRRE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Georgia

_____

(March 18, 2010)

Before TJOFLAT, WILSON and FAY, Circuit Judges.

PER CURIAM:

Ramon Aguirre appeals from his convictions and sentences for tax evasion, in violation of 26 U.S.C. § 7201. On appeal, he raises various arguments related to the district court's denial of his motion to suppress, its evidentiary rulings, and his sentencing. Aguirre contends that the court erred in denying his motion to suppress because the warrant authorizing a search of New Era Tax Service ("NETS") was overly broad on its face, and the Internal Revenue Service ("IRS") agents who searched his office exceeded the scope of the warrant. Addressing the court's evidentiary rulings, Aguirre argues that the court abused its discretion under Fed.R.Evid. 404(b) by: (1) denying his motion to exclude evidence that he defrauded the Department of Veterans Affairs ("VA"), thus overruling his objection that the government's notice of its intent to introduce this extrinsic evidence was untimely; and (2) prohibiting him from introducing evidence related to Jose Cruzastol's preparation of fraudulent tax returns for various individuals. He also contends that the court infringed on his Sixth Amendment right to present a defense by barring his proposed evidence concerning Cruzastol.

Regarding his sentence, Aguirre argues that the district court clearly erred in calculating the tax loss amount at sentencing by holding him responsible for Rabel General Service's ("RGS") corporate tax liability, because it failed to make factual findings in support of its determination of the amount of RGS's tax liability.

2

Finally, Aguirre asserts that the court erred by increasing his offense level under U.S.S.G. § 2T1.1(b)(1) based on his illegal receipt of VA benefits. In connection with this argument, he asserts that, while this guideline may apply where a defendant fails to report income from an illegal kickback scheme to the IRS, it does not apply where a defendant conceals income from the VA. He further argues that this increase to his offense level was inappropriate because his trial focused on his failure to report his income to the IRS, not VA fraud.

For the reasons set forth below, we affirm in part, and remand in part for the limited purpose of permitting the district court to make factual findings in support of its determination of the amount of RGS's corporate tax liability.

## I.

A federal grand jury indicted Aguirre for the following offenses: (1) falsely reporting that he and his wife had no taxable income for 2001 ("Count 1"); (2) failing to file a personal income tax return for 2002 ("Count 2"); (3) failing to file a personal income tax return for 2003 ("Count 3"); and (4) failing to file a personal income tax return for 2004 ("Count 4"), all in violation of 26 U.S.C. § 7201. (R1-1).

The magistrate judge entered a scheduling order, which provided that, under the court's local rules, the government should provide Aguirre with written notice

3

of any evidence it intended to admit under Fed.R.Evid. 404(b) within 20 days after arraignment. The order specified that any notice of 404(b) evidence should "outline in general form the evidence to be offered" and state the purpose for which it was offered. Aguirre was arraigned on April 28, 2008.

Shortly after the magistrate entered the scheduling order, Aguirre filed a written request that the government provide him with notice of any evidence of previous crimes or bad acts that it intended to present at trial. On May 27, 2008, the government responded, stating that it intended to introduce, under either Rule 404(b) or as evidence inextricably intertwined with the charged offenses, "any evidence now known or later learned regarding the defendant's prior frauds against the government."

Aguirre filed a motion to suppress, explaining that, on August 18, 2005, IRS Agent Stephanie Huebner obtained a warrant to search the "office and storage areas" of NETS, which was formerly known as J.R. Cruz Tax Service ("JRCTS"). He further explained that Jose Cruzastol owned this tax preparation service, which was located at 3107 Old McDuffie Road, Augusta, Georgia. Aguirre stated that he owned an automotive repair service, RGS, which was located next to NETS at 3109 Old McDuffie Road. Aguirre alleged that, despite the fact that Huebner was aware that he maintained a separate office at 3107 Old McDuffie Road, she failed

4

to specify this fact in the warrant, and, on August 19, IRS agents searched the entirety of the premises at 3107 Old McDuffie Road, including his office. Aguirre arrived at the location during the search, and informed the agents that his office was used only for RGS business. The agents, however, refused to discontinue their search, and seized documents which, on their face, pertained to RGS. Almost two months after the search, IRS agents informed Aguirre that he was the subject of a criminal investigation. On November 3, 2005, March 14, 2007, and April 10, 2007, Aguirre met with IRS agents and answered their questions about RGS, NETS, and his personal financial information.

Aguirre argued that the IRS agents who conducted the search violated his Fourth Amendment rights, and requested that the court suppress any evidence and statements obtained as a result of the search. Aguirre asserted that the agents exceeded the scope of the warrant by searching his office and seizing RGS documents. He argued that he had placed the agents on notice that his office was used only for RGS business, and that the agents were required to discontinue their search as soon as he provided them with this notice. Aguirre also argued that the statements he made during his subsequent three interviews with IRS agents should be suppressed because these interviews were based on the fruits of the illegal search. He alleged that he became the subject of a personal tax fraud investigation

5

based on the documents that IRS agents seized during the August 19 search.

Aguirre attached a copy of the search warrant and Huebner's supporting affidavit to his motion. The warrant authorized IRS agents to search the:

> Office and storage areas of the business known as New Era Tax
> Service fka J.R. Cruz Tax Service
> 3107 Old McDuffie Road
> Augusta, Georgia 30906

The warrant listed the items to be seized as "contraband, fruits and instrumentalities and evidence of the commission of the crime of a violation of 18 U.S.C. § 371 and 26 U.S.C. §§ 7206(1) and 7206(2) as described in the attached affidavit."

The warrant was supported by an affidavit executed by Huebner. In her affidavit, Huebner alleged that the IRS had been conducting surveillance on NETS, and that the results of this surveillance gave them reason to believe that Cruzastol was preparing client tax returns that grossly exaggerated business expenses and charitable deductions. Aguirre had prepared a fraudulent tax return for at least one NETS client, and, along with Cruzastol, had attended a meeting with an IRS officer in order to discuss the IRS's concerns about NETS's tax filings. Thus, Huebner believed that Cruzastol filed false tax returns for NETS clients, and that Aguirre was a NETS employee. Huebner stated that Aguirre's hardware, software, and documents likely contained evidence of tax fraud because he worked at NETS and

6

had prepared a fraudulent tax return for at least one NETS client. Huebner included NETS and JRCTS client documents in her list of items to be seized.

The magistrate conducted a hearing regarding Aguirre's motion to suppress. At this hearing, Huebner testified that, when she and other IRS agents arrived at NETS offices to conduct the search on August 19, 2005, the door to Aguirre's office was unlocked. Although the door to Aguirre's office had a picture of a car on it, it did not bear any signs or lettering with the words "Rabel General Services" or "RGS." Aguirre arrived at NETS during the course of the search, and told the agents that they should not be inside of his office because he used it to conduct business on behalf of RGS only. In response to Aguirre's statement, Huebner asked the other IRS agents whether there was an RGS sign on Aguirre's door, and the agents informed her that there was no such sign, and that they had found numerous documents related to NETS business inside of Aguirre's office. Huebner ordered the agents to continue the search. In addition, Huebner testified that RGS was a tax client of NETS and JRCTS.

The magistrate entered a report and recommendation, recommending that the court deny Aguirre's motion to suppress. The magistrate found that, at the time of the search, Aguirre's office was unlocked and was not labeled as an RGS office. The magistrate further found that the IRS agents did not exceed the scope of the

7

warrant because Aguirre's office fell within the parameters of the warrant. The magistrate reasoned that the warrant authorized a search of NETS, and Aguirre assisted with NETS business. The magistrate further found that the agents did not exceed the scope of the warrant because there was no evidence that the agents should have been on notice that 3107 Old McDuffie Road contained RGS offices or property. In support of this finding, the magistrate noted that agents found numerous NETS documents in Aguirre's office. Addressing Aguirre's argument that IRS agents impermissibly seized documents related only to RGS, the magistrate found that this seizure was permissible because RGS was a client of NETS. The magistrate concluded that, because the August 19, 2005 search was not illegal, Aguirre's statements to IRS agents during his November 2005, March 2007, and April 2007 interviews should not be suppressed as fruits of an illegal search. The court adopted the magistrate's report and recommendation over Aguirre's objections.

On January 8, 2009, which was several days before trial, Aguirre filed a motion *in limine*, informing the court that he had just received notice that the government intended to introduce documents showing that he had illegally received VA disability benefits. He argued that this evidence should be excluded under Fed.R.Evid. 404(b) and 403. He asserted that the government's disclosure

8

of the VA documents occurred only five calendar days and two business days before trial, thus depriving him of the ability to meaningfully defend against the evidence. He also asserted that this disclosure violated the magistrate's scheduling order. Aguirre noted, however, that, in its discovery, the government had disclosed to him an IRS memorandum in which Huebner related that she had contacted the VA regarding Aguirre's disability status.

Aguirre attached a copy of Huebner's memorandum to his motion *in limine*. In the memorandum, which was prepared in September 2007, Huebner averred that she had called Kathy Hersey, a special agent employed by the VA Office of the Inspector General, on June 8, 2007. In response to Huebner's questions regarding Aguirre's disability status, Hersey stated that Aguirre was awarded 100% disability status in 1999 based on his representation that he could not work due to a disability. Aguirre had informed the VA that he had sold his automotive repair business, and did not report to the VA that he subsequently found employment elsewhere. Huebner stated that she asked for copies of Aguirre's VA documents, but "Hersey was reluctant to provide the documents since [the] VA was not officially involved in the investigation."

Aguirre also attached copies of the VA documents that the government had recently provided to him. These documents included, among other things:

(1) three letters from the VA to Aguirre, dated 2002, 2003, and 2004, asking that Aguirre inform the VA if he had found employment or had become self-employed, as his employment income could result in a decrease to his disability compensation; and (2) a letter from the VA to Aguirre, dated 1999, informing Aguirre that he was entitled to disability compensation in light of the fact that he had sold his business and was unable to secure other employment.

The government also filed a motion *in limine*, requesting that, pursuant to Fed.R.Evid. 609, Aguirre be prohibited from cross-examining any government witness concerning the witness's prior bad acts or specific instances of misconduct, unless the matter involved dishonesty.

Immediately before the trial began, the government addressed Aguirre's motion *in limine* concerning the VA documents. The government stated that the VA had initially refused to turn Aguirre's documents over to Huebner, and that it had provided Huebner's memorandum about her conversation with Hersey to Aguirre shortly after his arraignment. The government explained that it did not obtain the VA records until Aguirre requested a document that Huebner had referenced in her memorandum, and the government responded to Aguirre's request by issuing a subpoena for the VA records. The government averred that it forwarded the documents to Aguirre immediately after it received them. The

10

government conceded that the evidence of Aguirre's VA fraud was extrinsic, but asserted that it should be admitted because it provided a motive for Aguirre's failure to report his employment income to the IRS. The court deferred its ruling on the matter.

During Aguirre's trial, Huebner testified that she investigated Aguirre for tax evasion for the years 2001-2004. Huebner identified certain documents as financial statements that Aguirre had provided to banks between 2001 and 2004 in order to obtain loans or other lines of credit. These documents generally reflected that Aguirre received at least $80,000 in annual income from his employment with RGS, and that he had over $1,000,000 in assets. Huebner also reviewed Aguirre's IRS records for 2001 to 2004, which reflected that Aguirre reported that he did not receive any employment income in 2001. These documents also reflected that Aguirre did not file a personal income tax return for tax years 2002, 2003, and 2004. As part of her investigation, she met with Aguirre on several occasions to review his finances. During these meetings, they reviewed Aguirre's and RGS's transactions, and Aguirre would classify each transaction as a business or personal expense. Based on this process, Huebner was able to calculate Aguirre's unreported taxable income for 2001-04. During one of these meetings, Aguirre told Huebner that he did not want to report his income in his tax returns because it

11

would affect his VA disability payments.

After the conclusion of Huebner's testimony on direct examination, Aguirre addressed the government's motion *in limine* to prohibit him from questioning government witnesses about their previous bad acts. Aguirre argued that, in the event that the government called Cruzastol as a witness, he should be able to question Cruzastol regarding the fact that he falsified information such as deductions on client tax returns, because these were acts of dishonesty. He asserted that evidence that Cruzastol prepared fraudulent tax returns was "at the heart of [the] defense" because he had relied on Cruzastol as a tax preparer. He also argued that the evidence was admissible under Fed.R.Evid. 406 as evidence of Cruzastol's business habits. Aguirre stated that he also wished to present the testimony of Lisa Owens Smith, who would testify that Cruzastol forged her name to fraudulent tax returns.

The court determined that Fed.R.Evid. 404 and 403 prohibited the defense from presenting evidence that Cruzastol filed fraudulent tax returns for various individuals. The court reasoned that the defense sought to show that Cruzastol had a particular character trait, and that he must have acted in conformity with this trait when he handled Aguirre's tax returns. The court further found that this evidence regarding Cruzastol was extrinsic. The court explained that it did not want to

12

suggest to the jury that it should compare Aguirre's culpability to Cruzastol's culpability, or that it should consider whether Aguirre, rather than Cruzastol, was properly prosecuted by the U.S. Attorney's Office. Thus, the court determined that, to the extent the government's motion *in limine* sought to exclude this evidence, it was granted.

Addressing his motion *in limine* to exclude the evidence of his VA disability benefits, Aguirre argued that this was extrinsic evidence of which the government had failed to provide timely notice, as required by Rule 404(b). Aguirre argued that, even if Hersey had refused to give Aguirre's VA documents to Huebner, the government could have subpoenaed the VA documents. Aguirre further argued that, in any event, these documents constituted extrinsic evidence that could cause the jury to conclude that he had defrauded the VA.

The court stated that it had "some concern" that this evidence could confuse the jury or prejudice Aguirre. It also expressed its concern with the timeliness of the government's disclosure, although it credited the government's assertion that it did not receive the VA documents until shortly before the trial began. With these concerns in mind, the court ruled that the government could present only the VA documents that reflected that: (1) Aguirre received 100% disability compensation from the VA; and (2) he was required to report any employment income to the VA,

13

as this could reduce his disability payments. The court reasoned that, "these documents flush out precisely what [Aguirre] had to lose if he filed a true tax return." The court excluded the remaining VA documents, finding that the introduction of all of this evidence could confuse the jury and prejudice Aguirre by showing that he concealed another crime.

When Huebner resumed her testimony on cross-examination, she testified that Cruzastol had prepared Aguirre's personal tax returns during the 1990's. During her interviews with Aguirre, Aguirre told her that Cruzastol had handled RGS's corporate tax returns for tax years 2001-2004. Aguirre also told Huebner that he had not reviewed the 2001 tax return that Cruzastol prepared for RGS. Aguirre also told her that Cruzastol had prepared the financial statements that he had provided to banks between 2001 and 2004, and that he had not reviewed these statements after he received them from Cruzastol. Aguirre further stated to Huebner that he thought that Cruzastol had filed his tax returns for him.

Brandon Barnes, a VA representative, testified that he had received a request to bring Aguirre's VA records to court. Aguirre objected to this line of questioning and the introduction of documentary evidence from the VA, adopting his previous objections to this evidence under Rules 403 and 404(b). Barnes identified a document as a letter that had been sent from the VA to Aguirre in February 1999,

14

and the court admitted this document into evidence over Aguirre's objection. Barnes explained that his letter notified Aguirre that his disability benefits had been modified, and that he now received disability benefits at a rate of 100% because he was unemployable. Barnes identified a set of three documents as letters that were sent from the VA to Aguirre, each of which instructed Aguirre to notify the VA if he received any income from employment, as this could decrease the amount of compensation he received. Aguirre had received these letters in 2002, 2003, and 2004. The court admitted these letters into evidence over Aguirre's objection.

Shelley Berry testified that she had worked for Aguirre over the course of four years, beginning in 2003. She testified that Aguirre was the "head man" who ran NETS, and that Aguirre handled hiring decisions and writing checks on behalf of NETS. On cross-examination, Berry testified that Cruzastol had inflated the mileage reports on his clients' tax returns. Cruzastol, along with another employee, had been responsible for preparing client tax returns. Cruzastol had prepared her personal tax returns in 2003 and 2004. Berry admitted that these tax returns falsely reported that she did not receive any income from RGS.

After the conclusion of the government's case, Aguirre presented the testimony of several witnesses in his defense. Aguirre did not testify in his own

15

defense, and none of the defense witnesses testified that Aguirre relied on Cruzastol to file his personal tax returns between 2001-2004. The jury convicted Aguirre of Counts 1-4.

In preparing Aguirre's presentence investigation report ("PSI"), the probation officer noted that, under U.S.S.G. § 2T1.1(a), the base offense level for tax evasion was based on the amount of tax loss caused by the defendant's conduct. In calculating the tax loss, the probation officer found that Aguirre should be held responsible for both his personal tax liability and RGS's corporate tax liability. The officer stated that, "RGS's tax liability for tax years 2001 through 2004 was $40,676; $100,708, $54,043, and $43,918, respectively." The officer did not explain how he arrived at these figures. In addition, the officer noted that IRS officials determined that Aguirre had a personal tax liability of $108,204. The officer combined Aguirre's personal and corporate tax liability to find that Aguirre's tax loss amount was $347,549. Pursuant to the loss table set forth in U.S.S.G. § 2T4.1(G), the officer determined that this tax loss amount yielded a base offense level of 18.

The probation officer then increased Aguirre's offense level by two levels under § 2T1.1(b)(1), because the fact that he did not report income between 2001-2004 enabled him to receive VA disability benefits of approximately $15,708 each

16

year.  The officer increased Aguirre's offense level by another two levels under § 2T1.1(b)(2) based on his finding that Aguirre's offense involved the use of sophisticated means.  Accordingly, the officer determined that Aguirre's total offense level was 22.  Based on a total offense level of 22 and a criminal history category of I, the officer set Aguirre's guideline range at 41 to 51 months' imprisonment.

Aguirre filed written objections to the PSI.  He objected to the two-level increase under § 2T1.1(b)(1) , arguing that his receipt of VA disability benefits was not at issue in this case, and that § 2T1.1(b)(1) typically applied in situations where a defendant had failed to report to the IRS income received from illegal kickbacks.  Aguirre also objected to the probation officer's determination that RGS's corporate tax liability should be included in his tax loss amount under § 2T4.1, asserting that the government had failed to present any evidence establishing the amount of RGS's tax liability.

At sentencing, Aguirre reiterated his objection to the increase under § 2T1.1(b)(1), again arguing that this guideline was typically applied where a defendant failed to report income received from an illegal kickback scheme to the IRS, not where one failed to report income to the VA.  The court reasoned that Aguirre's receipt of VA disability benefits played a large role in his case because

17

his interest in these benefits motivated him to fail to report his employment income. The court also reasoned that it saw no difference between a defendant's failure to report income to the IRS and a defendant's failure to deal honestly with the VA.

Aguirre also reiterated his objection to the PSI's aggregation of his personal tax liability and RGS's tax liability. The government responded that, at trial, Huebner had testified regarding Aguirre's business and personal expenses. The government asserted that this testimony had reflected RGS's income. Aguirre argued that no government agent had testified regarding RGS's tax liability. The court found that the PSI appropriately aggregated Aguirre's and RGS's tax liabilities, but did not make any statement concerning the specific amount of corporate tax liability attributed to RGS.

The court adopted the PSI's factual findings and guideline applications, with the exception that it found that Aguirre's conduct did not warrant a two-level increase for the use of sophisticated means under § 2T1.1(b)(2). Thus, the court determined that Aguirre had a total offense level of 20 which, when combined with his criminal history category of I, produced a guideline range of 33 to 41 months' imprisonment. The court sentenced Aguirre to a term of 36 months' imprisonment. The court asked the parties if they had any objections to the sentence or the manner

18

in which it was calculated, and Aguirre stated that he adopted his previously filed written objections to the PSI.

## II.

"We review a district court's denial of a motion to suppress evidence as a mixed question of law and fact, with rulings of law reviewed *de novo* and findings of fact reviewed for clear error." *United States v. Lindsey*, 482 F.3d 1285, 1290 (11th Cir. 2007). In addition, we view the facts "in the light most favorable to the prevailing party in [the] district court." *Id.* Where a defendant fails to raise an argument before the district court, however, we will review the argument on appeal only for plain error. *United States v. Martinelli*, 454 F.3d 1300, 1310 (11th Cir. 2006). In order to satisfy plain-error review, the defendant must demonstrate: "(1) error, (2) that is plain, and (3) that affects substantial rights." *Id.* at 1310-11 (quotation omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* at 1311 (quotation omitted).

The Fourth Amendment guarantees "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment's Warrant Clause

19

requires that a search warrant must "particularly describ[e] the place to be searched, and the persons or things to be seized." *Id.*; *Maryland v. Garrison*, 480 U.S. 79, 84, 107 S.Ct. 1013, 1016, 94 L.Ed.2d 72 (1987). The purpose of this requirement is to prevent "wide-ranging exploratory searches." *Garrison*, 480 U.S. at 84, 107 S.Ct. at 1016. Statements obtained from a defendant as a result of an illegal search may be suppressed as the fruit of an illegal search. *See United States v. Terzado-Madruga*, 897 F.2d 1099, 1112-13 (11th Cir. 1990).

A warrant is sufficient where it describes "the place to be searched with sufficient particularity to direct the searcher, to confine his examination to the place described, and to advise those being searched of his authority." *United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir. 1986); *see also Steele v. United States*, 267 U.S. 498, 503, 45 S.Ct. 414, 416, 69 L.Ed. 757 (1925) (holding that "[i]t is enough if the description is such that the officer with a search warrant can, with reasonable effort[,] ascertain and identify the place intended"). The particularity requirement allows a practical margin of flexibility, depending on the type of property to be seized, and "a description of property will be acceptable if it is as specific as the circumstances and nature of activity under investigation permit." *United States v. Wuagneux*, 683 F.2d 1343, 1349 (11th Cir. 1982).

In *Garrison*, the Supreme Court addressed a situation where the police

obtained a search warrant to search a third-floor apartment, believing that there was only a single apartment on the third floor. 480 U.S. at 80, 107 S.Ct. at 1014. In fact, there were two apartments on the third floor, and the police, in executing the search warrant, conducted a search of the second apartment before discovering that it was a separate apartment. *Id.* Acknowledging that the search warrant's description of the place to be searched was inaccurate, the Supreme Court nevertheless held that the warrant did not violate the particularity requirement because the affiant had reasonably believed that the third floor housed only one apartment. *Id.* at 85-86 & n.10, 107 S.Ct. at 1017 & n.10; *see also United States v. Ofshe*, 817 F.2d 1508, 1514 (11th Cir. 1987) (holding that a warrant was sufficiently particular, despite the fact that it failed to mention that one of the seven offices in a multiple-use commercial building was used for a separate business, because the officers reasonably believed that all of the offices inside the building were part of the business that was the target of the warrant). The Supreme Court also held, however, that the executing officers were "required to discontinue the search of [the defendant's] apartment as soon as they discovered that there were two separate units on the third floor." *Garrison*, 480 U.S. at 87, 107 S.Ct. at 1018.

Although Aguirre argued to the district court that the IRS agents exceeded the scope of the warrant by searching his office and seizing RGS documents, he

21

did not argue that the warrant lacked sufficient particularity on its face. As a result, plain-error review applies to Aguirre's argument that the warrant lacked sufficient particularity. The court did not err, let alone plainly err, in failing to find that the warrant lacked sufficient particularity because it failed to note that 3107 Old McDuffie Road housed an RGS office as well as NETS offices. Huebner's affidavit reflected that she and other agents had conducted surveillance of NETS for approximately two years before they obtained the warrant, and that, during this time, they observed that Aguirre prepared at least one tax return for a NETS client and attended meetings concerning NETS business. In addition, this surveillance revealed no indication that Aguirre's presence or use of his office at 3107 Old McDuffie Road was related to RGS, and not NETS, business. Moreover, RGS was located at 3109 Old McDuffie Road, and thus had a separate address from NETS. Accordingly, at the time Huebner executed her affidavit in support of the warrant, she and other IRS agents, through their lengthy investigation of NETS, lacked information that reasonably should have put them on notice that 3107 Old McDuffie Road also housed an office and documents related only to RGS business.

Because Aguirre objected below that the IRS officers exceeded the scope of the warrant by searching his office, he has preserved this issue for appeal, and we review the district court's rulings of law as to this issue *de novo*. The agents who

executed the warrant did not exceed its scope. Once inside 3107 Old McDuffie Road, the agents discovered that Aguirre's office was unlocked, and that it lacked any markings related to RGS. While the agents may have been on notice that this was Aguirre's personal office, the warrant, together with Huebner's affidavit, authorized a search of Aguirre's office because he was believed to be a NETS employee. By the time that Aguirre arrived at NETS and informed the agents that his office was used for RGS business, the agents had already discovered numerous documents inside the office that clearly related to NETS business. Accordingly, the objective evidence available to the executing agents undermined Aguirre's self-serving contention that his office was not part of NETS. While Aguirre contends that the warrant did not authorize the seizure of RGS documents, this contention lacks merit because the warrant authorized the seizure of client documents, and RGS was a client of NETS. Accordingly, the evidence available to the agents did not reasonably place them on notice that Aguirre's office was not part of NETS. Thus, even assuming that Aguirre correctly argues that his subsequent interviews with IRS agents were fruits of this search, the search was permissible and, as a result, Aguirre's statements did not warrant suppression as fruits of an impermissible search.

**III.**

23

We review a district court's decision regarding the admissibility of evidence for abuse of discretion. *United States v. Schlei*, 122 F.3d 944, 990 (11th Cir. 1997).

Under Fed.R.Evid. 404(b):

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident, provided that upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

Fed.R.Evid. 404(b). Only extrinsic evidence is subject to the requirements of Fed.R.Evid. 404(b). *Schlei*, 122 F.3d at 990. "The policy behind 404(b) is to reduce surprise and promote early resolution on the issue of admissibility." *United States v. Perez-Tosta*, 36 F.3d 1552, 1561 (11th Cir. 1994) (quotation omitted).

We consider three factors in determining the reasonableness of pretrial notice under Rule 404(b): (1) when the proponent could have learned of the availability of the evidence; (2) the extent of the prejudice to the opposing party due to a lack of time to prepare to meet the evidence; and (3) how significant the evidence is to the proponent's case. *Perez-Tosta*, 36 F.3d at 1562.

Here, the district court did not abuse its discretion by denying Aguirre's

24

motion to exclude the documentary evidence of his VA fraud under Rule 404(b).

Aguirre correctly points out that the government did not timely provide him with a document expressly informing him that it intended to introduce documents indicating that he concealed his employment income from the VA so that he could receive disability benefits. Aguirre certainly had some notice of this evidence, however, because the government responded to his request concerning 404(b) evidence by informing him that it intended to introduce any evidence of his "prior frauds against the government," and also disclosed Huebner's memorandum concerning the VA documents during discovery. Significantly, Aguirre failed to explain below, and does not explain in his brief on appeal, how the lack of notice deprived him of the ability to challenge this evidence at trial. Thus, he has failed to demonstrate prejudice.

Finally, this evidence was significant to the government's case because it provided a motive for Aguirre's failure to file tax returns. Although Huebner testified that Aguirre told her that he did not want to report his employment income because he received disability benefits, she did not testify about this subject at length, and it does not appear that the government's brief presentation of several VA documents was needlessly cumulative. Accordingly, under these circumstances, the court did not abuse its discretion in admitting this evidence.

## IV.

Pursuant to Fed.R.Evid. 404(a), "Evidence of a person's character or a trait of character is not admissible for the purpose of proving action in conformity therewith on a particular occasion." Fed.R.Evid. 404(a). Nevertheless, "[e]vidence of the habit of a person or of the routine practice of an organization, whether corroborated or not and regardless of the presence of eye witnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in conformity with the habit or routine practice." Fed.R.Evid. 406; *Loughan v. Firestone Tire & Rubber Co.*, 749 F.2d 1519, 1523 (1985).

We have distinguished evidence of an individual's habit under Rule 406 from character evidence under Rule 404:

> Character is a generalized description of one's disposition, or one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness. Habit . . . describes one's regular response to a repeated specific situation. If we speak of character for care, we think of the person's tendency to act prudently in all the varying situations of life, in business, in family life, in handling automobiles, and in walking across the street. A habit, on the other hand, is the person's regular practice of meeting a particular kind of situation with a specific type of conduct, such as the habit of going down a particular stairway two stairs at a time, or giving the hand signal for a left turn, or of alighting from railway cars while they are moving. The doing of the habitual acts may become semi-automatic.

*Loughan*, 749 F.2d at 1524 (quotation omitted). In order to establish that evidence

26

of an individual's conduct on specific occasions rises to the level of admissible habit evidence, the proponent must show that the conduct occurred so often that it permits an "inference of systematic conduct." *Id.* (quotation omitted).

In considering whether a defendant should be permitted to introduce extrinsic evidence under Fed.R.Evid. 404(b), a district court should consider whether the evidence bears "special relevance" to the defendant's guilt, and whether there are any other practical means by which the defendant could prove his point. *See United States v. Cohen*, 888 F.2d 770, 775-76 (11th Cir. 1989); *United States v. Rodriguez*, 917 F.2d 1286, 1287, 1289-90 (11th Cir. 1990), *vacated on reh'g in part on other grounds*, 935 F.2d 194 (1991). For example, we have held that the district court abused its discretion under Rule 404(b) by excluding evidence that the defendants' co-conspirator, who was also the government's key witness, could have executed the charged fraudulent scheme without the defendants' involvement, because this evidence bore a special relevance to the defendants' guilt. *Cohen*, 888 F.2d at 775-76. In addition, in *Rodriguez*, we held that the district court did not abuse its discretion under Rule 404(b) by excluding evidence that the law enforcement officers who prosecuted the defendants may have entrapped a defendant in an unrelated case, because the defendants did not otherwise produce evidence that he was entrapped, and were

permitted to cross-examine the officers regarding their investigation tactics. 917 F.2d at 1287, 1289-90.

Also in *Rodriguez*, we rejected the defendants' arguments that the court's exclusion of various items of proffered evidence amounted to the denial of their Sixth Amendment rights to present a vigorous defense. *Id.* at 1291. We reasoned that the court had excluded only irrelevant evidence, and again noted that the defendants were able to cross-examine the government agents concerning their tactics. *Id.*

The court did not abuse its discretion in excluding Aguirre's proposed evidence regarding Cruzastol. As an initial matter, it appears that evidence that Cruzastol falsified information on tax returns for approximately a dozen individuals did not constitute evidence of habit under Rule 406. Evidence that Cruzastol engaged in this behavior on a dozen occasions does not rise to the level of demonstrating an individual's "regular practice," or his "semi-automatic" response to a particular situation. Rather, the court did not abuse its discretion in construing this proposed evidence as impermissible character evidence under Rule 404(b), because Aguirre sought to show that Cruzastol had acted dishonestly by falsifying information on other individuals' tax returns in support of his theory that Cruzastol had acted dishonestly by failing to file his tax returns. This evidence

28

appears to fall within Rule 404(a)'s prohibition on, "[e]vidence of a person's character or a trait of character . . . for the purpose of proving action in conformity therewith on a particular occasion."

Moreover, Aguirre's proposed evidence that Cruzastol made fraudulent statements on client tax returns did not bear a special relevance to the issue of his guilt. Apart from eliciting Huebner's testimony on cross-examination that Aguirre stated to her that he thought that Cruzastol had filed his tax returns, Aguirre did not present any evidence indicating that he had relied on Cruzastol to prepare his personal tax returns between 2001-2004. Moreover, even if the court had permitted Aguirre to introduce his proposed evidence, its probative value would have been limited because it would have shown that Cruzastol falsified deductions on tax returns, not that he repeatedly failed to file tax returns or completely omitted employment income on tax returns. In addition, the fact that Berry testified that it was Aguirre who controlled NETS further undermined the probative value of the proposed evidence concerning Cruzastol. Accordingly, for the foregoing reasons, the court did not abuse its discretion in excluding this evidence under Rule 404(b).

Finally, the court's ruling on this matter did not infringe on Aguirre's Sixth Amendment right to present a vigorous defense, as this right does not encompass the right to introduce evidence that violates the federal rules. Although Aguirre

contends that his evidence regarding Cruzastol was crucial to his defense, the record does not include any indication that the court barred Aguirre from calling Cruzastol as a witness, or from testifying that he relied on Cruzastol to prepare and file his tax returns. Moreover, the court permitted Aguirre to cross-examine Berry about the fact that Cruzastol falsified information regarding mileage on client tax returns, and that Cruzastol also omitted Berry's RGS income from her 2003 and 2004 tax returns. The court also permitted Aguirre to cross-examine Huebner regarding Cruzastol's preparation of RGS's tax returns and Aguirre's financial statements. Accordingly, Aguirre's argument that the court prevented him from presenting a full defense lacks merit.

## V.

In the sentencing context, we review a district court's factual findings for clear error, and its legal conclusions *de novo*. *United States v. Gupta*, 572 F.3d 878, 887 (11th Cir. 2009), *cert. denied*, 463 F.3d 1182. "When a defendant challenges one of the factual bases of his sentence, the Government has the burden of establishing the disputed fact by a preponderance of the evidence." *Id.* (quotation and alteration omitted). "This burden must be satisfied with reliable and specific evidence." *Id.* (quotation omitted). A court need only make a reasonable estimate of loss. *Id.* at 888. However, a court must make factual findings

30

sufficient to support the loss amount set forth in the PSI, and "cannot simply rely upon conclusory factual recitals of the PSI." *United States v. Renick*, 273 F.3d 1009, 1026 (11th Cir. 2001) (quotation omitted). Where a district court fails to identify the factual basis for its loss determination, meaningful appellate review is not possible. *Gupta*, 572 F.3d at 889.

Here, it appears that the court clearly erred by failing to make factual findings in support of its determination that RGS's tax liability was $239,345. Because Aguirre objected to this calculation of RGS's loss amount, the court was required to make factual findings concerning this matter, rather than simply rely on the PSI. It bears noting that, in the PSI, the probation officer did not provide an explanation as to how he arrived at this figure. The trial transcript reflects that Huebner merely testified that she reviewed RGS's business transactions. She did not testify as to the amount of RGS's corporate tax liability. While the probation officer's determination of RGS's tax liability may have been based on the IRS's reliable and specific computation, the record does not demonstrate this fact. Importantly, at the sentencing hearing, the parties and the court did not discuss the basis for the computation of RGS's tax liability, and it thus is not ascertainable why or how the court concluded that it should adopt the PSI's calculation of this figure. Accordingly, it appears that meaningful appellate review of the court's tax

31

loss determination is not possible, and we remand as to this issue so that the district court may clarify its factual findings in this regard.

**VI.**

We review the district court's interpretation and application of the Sentencing Guidelines *de novo*. *United States v. Barakat*, 130 F.3d 1448, 1452 (11th Cir. 1997). We may affirm the district court based on any ground supported by the record. *United States v. Campa*, 529 F.3d 980, 998 (11th Cir. 2008).

In determining a defendant's offense level, the district court should consider not only the offenses of conviction, but also the defendant's relevant conduct, which includes, among other things, "all acts and omissions committed . . . by the defendant." U.S.S.G. § 1B1.3(1)(A); *United States v. Ignancio Munio*, 909 F.2d 436, 438-39 (11th Cir. 1990). The district court must take into account "the totality of the criminal transaction in which the defendant participated and which gave rise to his indictment, without regard to the particular crimes charged in the indictment." *Ignancio Munio*, 909 F.2d at 438.

The Guidelines provide that, in a tax evasion case, a defendant's offense level should be increased by two levels, "[i]f the defendant failed to report or correctly identify the source of income exceeding $10,000 in any year from criminal activity." U.S.S.G. § 2T1.1(b)(1). Under this guideline, the term

"criminal activity" refers to "any conduct constituting a criminal offense under federal, state, local, or foreign law." U.S.S.G. § 2T1.1 comment. (n. 3). Under 18 U.S.C. § 641, it is illegal for any individual to steal or embezzle money belonging to a U.S. agency, including the VA. 26 U.S.C. § 641; *See United States v. Moore*, 504 F.3d 1345, 1347 (11th Cir. 2007) (noting that § 641 prohibits the theft of money belonging to the VA).

Here, Aguirre's argument that the court could not properly increase his sentence due to his VA fraud because this conduct was not charged in the indictment lacks merit, as our precedent forecloses this argument. Moreover, it appears that Aguirre's VA fraud qualified as relevant conduct under § 1B1.3(1)(A), since his failure to report his employment income, as charged in the indictment, enabled his receipt of VA disability benefits.

Regardless of whether § 2T1.1(b)(1) could properly apply where a defendant conceals income from the VA, the district court's application of this guideline to Aguirre may be upheld under an alternative rationale. Under the plain language of § 2T1.1(b)(1), a defendant may receive a two-level increase to his offense level where he fails to report $10,000 or more in income derived from illegal activity to the IRS. Because the commentary to this guideline provides that it applies to any type of illegal activity, and 18 U.S.C. § 641 prohibits the theft of government

agency funds, it appears that Aguirre's fraudulent receipt of VA disability benefits falls within the guideline. Because the jury found Aguirre guilty of failing to file tax returns in 2002, 2003, and 2004, the record reflects that Aguirre did not report his illegally received income to the IRS. Accordingly, it appears that Aguirre's conduct falls within the plain meaning of § 2T1.1(b)(1), and Aguirre does not point to controlling case law demonstrating otherwise.

Aguirre's convictions are affirmed; his sentence is vacated and the case is remanded for a recalculation of the loss amount to be used in resentencing.

**AFFIRMED IN PART, REMANDED IN PART WITH INSTRUCTIONS.**